INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
UAW, LOCAL 6000 v STATE OF MICHIGAN

HAIK v STATE OF MICHIGAN

Docket Nos. 150366, 150367. Submitted May 22, 1992, at Lansing.
    Decided June 5, 1992, at 9:00 A.M. In lieu of granting leave to
    appeal, the Wayne Circuit Court is to adjudicate the question
    whether a permanent injunction should issue and to enter a
    final order on the merits within thirty days of the date of this
    order. MCR 7.302(F)(1). This order is without prejudice to the
    filing of an application for leave to appeal before decision by
    the Court of Appeals, MCR 7.302(B)(4), upon completion of
    proceedings in the trial court and entry of the final order as
    directed by this Court. In all other respects leave to appeal is
    denied. Jurisdiction is not retained. 440 Mich 858.

    The International Union, United Automobile, Aerospace and
    Agricultural Implement Workers of America, UAW, and its
    local 6000 brought an action in the Wayne Circuit Court
    against the Department of Mental Health and its director,
    seeking permanent injunctive and declaratory relief, a writ of
    mandamus, and a temporary restraining order or preliminary
    injunction to prevent the scheduled layoff of union members
    employed at the Lafayette Clinic in the City of Detroit. The
    union argued that the defendants' actions violated constitu-
    tional provisions regarding the separation of powers and the
    proper manner of reducing expenditures of funds already ap-
    propriated, and provisions of the Mental Health Code specifi-
    cally requiring the department to maintain the clinic.

    Pearl Haik, the Mental Health Association of Michigan, and
    others brought a similar action in the Wayne Circuit Court
    against the same defendants and others, seeking similar relief.

    In both cases, the court, Richard P. Hathaway,J., entered

REFERENCES

Am Jur 2d, Constitutional Law §§ 303-305; Health §§ 9 et seq.;
    Injunctions §§ 87 et seq.; Labor and Labor Relations §§ 2071 et
    seq.
See the Index to Annotations under Constitutional Law; Health;
    Injunctions; Labor and Employment.

preliminary injunctions preventing the defendants from laying off employees of the clinic, eliminating certain programs, and otherwise implementing the plan to reduce the size and the nature of the services offered at the clinic. The defendants also were required to reopen admissions, readmit patients previously discharged or transferred pursuant to the downsizing plan, and otherwise maintain the staffing and operations of the clinic as they existed before implementation of the plan. The defendants appealed by leave granted. The Court of Appeals ordered that the cases be submitted together for decision.

The Court of Appeals *held:*

1. The court properly found that the plaintiffs have shown a substantial likelihood of success on the merits of their constitutional claims.

First, the executive branch of the government possesses no inherent constitutional power to decline to spend in the face of a clear legislative intent and statutory directive to spend. In this case, the Legislature, in 1991 PA 122, included specific appropriations for the Lafayette Clinic. This constitutes a clear indication of the Legislature's intent that the clinic is an institution that the Department of Mental Health is required to operate. The defendants exceeded their discretion and constitutional authority by ignoring the clear legislative intent and statutory directive to spend.

Second, the plaintiffs are likely to prevail on their claim that the defendants' actions cannot be justified under Const 1963, art 5, § 20. The first sentence of that section, "No appropriation shall be a mandate to spend," is intended to cover situations in which unforeseen efficiencies and economies might become possible. The defendants cannot justify reducing expenditures of funds appropriated for Lafayette Clinic because of unforeseen efficiencies and economies because the economies and efficiencies justifying the downsizing plan were the same ones identified by the Governor in January 1991 when he unsuccessfully sought to close the clinic and to amend the Mental Health Code to remove the language mandating the maintenance of the clinic. These economies and efficiencies cannot have been unforeseen when the Governor signed the mental health appropriation bill in October 1991, which contained specific appropriations for the clinic.

Third, the sentence in Const 1963, art 5, § 20 that states that reductions in expenditures shall be made in accordance with procedures prescribed by law refers to provisions in the Management and Budget Act, MCL 18.1101 *et seq.*; MSA 3.516(101) *et seq.*, that provide mechanisms for adjusting mismatched

appropriations and expenditures. Section 372(4) of the act implements the directive of art 5, § 20 that appropriated funds need not be spent. Section 372(4) should be interpreted to require that the administrative efficiencies identified by the state budget director be "unforeseen" within the meaning of the.first sentence of art 5, § 20.

Fourth, the plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the downsizing plan would amount to a partial line-item veto of the specific appropriations for the clinic. The Governor must either accept a line item or veto it.

2. The plaintiffs have shown a substantial likelihood of success on the merits of their argument that the downsizing plan violates §§ 900, 902, and 904 of the Mental Health Code, MCL 330.1900 et seq.; MSA 14.800(900) et seq. The defendants' contract with Wayne State University to conduct research at the clinic violates § 902 to the extent that the contract reduces the clinic director's supervision and control of the operation and personnel of the clinic, and the defendants' downsizing plan effectively restructures the clinic into a research-only facility in violation of the legislative intent embodied in the mandatory provisions of §§ 900 and 904 that the clinic function as a psychiatric hospital providing both inpatient and outpatient services that were reaffirmed in the specific appropriations for the clinic in 1991 PA 122.

3. An injunction in aid of arbitration was appropriate to preserve the status quo and to prevent from being rendered a nullity any award by the arbitrator in favor of the union with regard to its grievances challenging the layoffs and the transfer of research activities from the clinic to Wayne State University.

4. The circuit court did not err in concluding that the individual plaintiffs demonstrated likely irreparable harm in the absence of an injunction. The injunctions were not overly broad.

Affirmed.

1. CONSTITUTIONAL LAW — APPROPRIATIONS BY LEGISLATURE — SPENDING BY EXECUTIVE BRANCH.

The executive branch of the government possesses no inherent constitutional power to decline to spend in the face of a clear legislative intent and statutory directive to spend.

2. CONSTITUTIONAL LAW — APPROPRIATIONS BY LEGISLATURE — REDUCTIONS IN EXPENDITURES.

The constitutional provision that no appropriation shall be a

mandate to spend is intended to cover situations in which unforeseen efficiencies and economies might become possible; the sections of the Management and Budget Act that provide mechanisms for adjusting mismatched appropriations and expenditures are the procedures prescribed by law through which reductions in expenditures must be made (Const 1963, art 5, § 20; MCL 18.1372[4]; MSA 3.516[372][4]).

3. CONSTITUTIONAL LAW — GOVERNOR'S VETO POWER.

The Governor must either accept a line item in an appropriation bill or veto it; a partial line-item veto is not authorized by the constitution (Const 1963, art 5, § 19).

4. MENTAL HEALTH — TRAINING AND RESEARCH PROGRAMS — LAFAYETTE CLINIC — DIRECTOR'S SUPERVISION AND CONTROL.

The Mental Health Code provides that the director of the Lafayette Clinic in Detroit has complete supervision and control of the operation and personnel of the clinic, including any training and research programs established at the clinic (MCL 330.1902, 330.1904; MSA 14.800[902], 14.800[904]).

5. MENTAL HEALTH — PSYCHIATRIC CARE AND TREATMENT — LAFAYETTE CLINIC.

The Mental Health Code requires the Department of Mental Health to maintain in the City of Detroit a psychiatric hospital and outpatient clinic known as the Lafayette Clinic; the clinic must conduct a program that includes both inpatient and outpatient services for those in need of psychiatric care and treatment (MCL 330.1900, 330.1904; MSA 14.800[900], 14.800[904]).

6. INJUNCTIONS — LABOR RELATIONS — ARBITRATION — ECONOMIC LOSS.

Economic losses to which union-represented employees are exposed as a result of an alleged breach of a collective bargaining contract are not the type of irreparable harm that would justify the granting of an injunction; although generally it is not proper to use a preliminary injunction to reinstate a terminated employee or to prevent the layoff of an employee pending exhaustion of the employee's grievance remedy, an injunction in aid of arbitration may be appropriate to preserve the status quo and to prevent an arbitrator's award from being rendered a nullity.

*William A. Wertheimer, Jr.,* and *Jordan Rossen,* General Counsel, and *Nancy Schiffer* and *M. Eliza-*

*beth Bunn,* Associate General Counsel, UAW, for the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, and Local 6000.

Michigan Legal Services (by *Susan McParland* and *Marilyn Mullane*), for Pearl Haik and others.

*Barnhart & Mirer, P.C.* (by *Michael Barnhart*), for the Mental Health Association of Michigan.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Acting Solicitor General, and *Clive D. Gemmill* and *Mark S. Meadows,* Assistant Attorneys General, for the defendants.

Amici Curiae:

*Miller, Cohen, Martens & Ice, P.C.* (by *Bruce A. Miller*), for the Alliance for the Mentally Ill of Michigan.

*O'Connor & Youmans, P.C.* (by *Doyle O'Connor*), for the Association for Children's Mental Health and the Lafayette Clinic Citizens Advisory Council.

*Frank J. Kelley,* Attorney General, and *A. Michael Leffler, Robert P. Reichel,* and *Steven E. Chester,* Assistant Attorneys General, and *Mary Kay Scullion* and *Allan L. Canady,* for Certain Democratic Members of the Michigan House of Representatives and Senate.

Before: CAVANAGH, P.J., WAHLS and FITZGERALD, JJ.

PER CURIAM. Defendants appeal by leave granted from preliminary injunctions entered by the Wayne Circuit Court on April 27, 1992. The

injunctions prevent defendants from laying off employees of the Lafayette Clinic, from eliminating certain programs, and from otherwise implementing a plan to reduce the size and the nature of services offered at Lafayette Clinic. Defendants are affirmatively required by the injunctions to reopen admissions, to readmit patients previously discharged or transferred pursuant to the downsizing plan, and to otherwise maintain the staffing and operations of the clinic as they existed before December 1991, when the downsizing plan was announced.

Finding no error, we affirm the circuit court's grant of preliminary injunctive relief.

I

The circuit court made the following findings of fact. On January 16, 1991, the Governor issued Executive Order 1991-5, detailing his plan for expenditure reductions for fiscal year 1990-91. The executive order proposed the closure of Lafayette Clinic, the transfer of its patients, and apportionment of its service area to remaining state psychiatric hospitals. The executive order requested amendments of portions of Chapter 9 of the Mental Health Code, MCL 330.1900 *et seq.*; MSA 14.800(900) *et seq.* In particular, the Governor requested amendments of the following sections:

> Sec. 900. The department of mental health shall maintain in the city of Detroit a psychiatric hospital and outpatient clinic known as Lafayette clinic.
> Sec. 902. The department shall designate a director of the Lafayette clinic who shall be a qualified psychiatrist with demonstrated ability as a teacher and administrator. The director shall have complete supervision and control of the operation and personnel of the clinic.

> Sec. 904. The department is authorized to establish in the Lafayette clinic a program especially designed to train personnel for the field of mental health, including such specialties as psychiatry, neurology, psychiatric social work, clinical psychology, psychiatric nursing, and others; and to conduct studies and research programs into the nature, cause, and methods of prevention, treatment, and care of mental and emotional disorders and disturbances. The clinic shall conduct a program which includes both an inpatient and outpatient service for those in need of psychiatric care and treatment.

The Governor requested that § 900 be amended to substitute "may" for "shall" and to eliminate the words "psychiatric hospital and outpatient," thus transforming a statute mandating the maintenance of a psychiatric hospital and outpatient clinic into a statute permitting maintenance of a clinic in Detroit. The Governor requested that § 902 be amended to substitute "may" for the first "shall." Finally, the Governor requested that § 904 be amended by deleting the last sentence, which contains the only mandatory language in that section.

The House Appropriations Committee rejected the executive order and the statute was not amended.

In its budget proposals for fiscal year 1991-92, the Department of Mental Health (DMH) recommended to the Governor that Lafayette Clinic be closed, that thirty research beds be moved to the Detroit Psychiatric Institute, and that the research activities conducted at the clinic be transferred to Wayne State University (WSU). This proposal was consistent with a memorandum dated January 25, 1991, from DMH's director of the Bureau of Hospitals to James Haveman, Jr., director of DMH,

which stated that the clinic should be closed because of "the restructuring and efficiencies occurring throughout the mental health system and other state departments."

It is unknown whether this budget proposal was included in the budget submitted by the Governor to the Legislature. In any event, on October 11, 1991, the Legislature enacted and the Governor signed HB 4582, 1991 PA 122, appropriating funds for DMH for fiscal year 1991-92. In addition to general appropriations for various services or functions performed by DMH, the act provides specific appropriations for certain mental health facilities. In particular, the act appropriates $12,500,100 for operation of Lafayette Clinic, describing the clinic as having an average population of 81 patients and 276 full-time equated classified positions.

On December 4, 1991, DMH announced a plan to downsize Lafayette Clinic to thirty-two beds to be used primarily for research, as opposed to medical treatment, purposes. The plan called for three of five wards to be closed: one adult ward, the children's ward, and the geriatric ward, leaving one adult and one adolescent ward. Of 270 staff positions, 160 would be eliminated through layoffs. Outpatient clinic and training functions would continue, but research functions would be transferred to WSU. On December 11, 1991, DMH began implementing the plan by cutting off admissions to the three wards scheduled for closure. On January 13, 1992, DMH submitted a request to the Department of Management and Budget to "unallot" the clinic's appropriation for the current fiscal year in the amount of $3.5 million. ("Unallotted" funds are not available for expenditure and lapse back to the general fund at the end of the fiscal year unless "reallotted.") Layoff notices were issued to clinic employees on January 29 and 31, 1992. In

addition, on January 31, DMH signed a contract with WSU to conduct mental health research functions at Lafayette Clinic. Finally, on February 26, DMH began transferring patients out of the clinic.

Plaintiff union filed its complaint on March 6, 1992, seeking permanent injunctive and declaratory relief and a writ of mandamus, and also requesting a temporary restraining order or preliminary injunction to prevent the layoff of union members scheduled to occur on March 14, 1992. The union argued that defendants' actions violated constitutional provisions regarding separation of powers and the proper manner of reducing expenditures of funds already appropriated, and that the actions violated provisions of the Mental Health Code specifically requiring DMH to maintain Lafayette Clinic. The union also sought injunctive relief to preserve the status quo pending arbitration of two grievances filed pursuant to a collective bargaining agreement between the union and defendants. In those grievances, the union challenged the propriety of layoffs and alleged improper subcontracting of bargaining unit work to nonbargaining-unit members through the transfer of research functions to WSU.

On March 11, 1992, the individual plaintiffs filed their complaint seeking similar relief under twelve separate counts.

The circuit court issued a number of temporary restraining orders and held hearings on seven days in March and April. On April 27, 1992, the court issued the preliminary injunctions at issue here and a twenty-six-page opinion in support of those orders, finding that all plaintiffs had satisfied the requirements for a preliminary injunction mandated by *Michigan State Employees Ass'n v Dep't of Mental Health,* 421 Mich 152, 157-158; 365 NW2d 93 (1984). The circuit court held that the

union had shown a substantial likelihood of success on the merits of its claims, and that the other plaintiffs had shown a substantial likelihood of success on the merits of counts I, X, XI, and XII of their amended complaint, which respectively allege violation of state constitutional provisions, violation of the Mental Health Code, violation of that portion of 1991 PA 122 that specifically appropriates funds for Lafayette Clinic, and entitlement to equitable relief.

The circuit court found that union members would suffer irreparable harm in the absence of an injunction, because they would be forced to make probably irrevocable employment decisions if their layoffs were not prevented. The court also found that the union would suffer irreparable harm to its status as exclusive collective bargaining agent if the layoffs were allowed to occur before exhaustion of the grievance-arbitration procedure.

The circuit court found that the individual plaintiffs and the individuals represented by plaintiff Mental Health Association of Michigan would suffer irreparable harm if they were discharged from, not allowed to return to, or not allowed to seek treatment at Lafayette Clinic because of defendants' downsizing plan.

Finding that plaintiffs would suffer greater harm if the injunctions were not granted than defendants would suffer if the injunctions were granted, and that the public interest would not be harmed if preliminary injunctive relief were granted, the court enjoined defendants from implementing the downsizing plan and ordered the clinic returned to the status existing before implementation of the downsizing plan.

Defendants filed emergency applications for leave to appeal with this Court on March 23, 1992, as well as motions for immediate consideration

and for a stay of proceedings. This Court granted the motions for immediate consideration, but held the applications and motions for stay in abeyance pending completion of the hearings before the circuit court. After the circuit court issued its orders and opinion on April 27, 1992, this Court granted the applications for leave to appeal but denied the motions for stay on April 29, 1992, setting an accelerated schedule for briefing. The Court also ordered that the cases be submitted for decision together. After hearing oral argument on May 22, 1992, and after reviewing the briefs of the parties and amici curiae, we affirm.

II

Plaintiffs argue that defendants' plan to downsize the Lafayette Clinic violates a number of provisions of the Michigan Constitution. Const 1963, art 3, § 2 provides:

The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

Article 5, § 19 provides:

The governor may disapprove any distinct item or items appropriating moneys in any appropriation bill. The part or parts approved shall become law, and the item or items disapproved shall be void unless re-passed according to the method prescribed for the passage of other bills over the executive veto.

Article 5, § 20 provides:

No appropriation shall be a mandate to spend.

The governor, with the approval of the appropriating committees of the house and senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based. Reductions in expenditures shall be made in accordance with procedures prescribed by law. The governor may not reduce expenditures of the legislative and judicial branches or from funds constitutionally dedicated for specific purposes.

Plaintiffs argue that defendants have overstepped their responsibility to execute the law and have instead attempted to usurp the place of the Legislature in creating law and appropriating funds, noting the specific appropriation for Lafayette Clinic in 1991 PA 122. Plaintiffs argue that defendants are in effect attempting to amend unilaterally the Mental Health Code's provisions regarding Lafayette Clinic, after failing to gain legislative agreement to such amendments. They also contend that defendants' actions amount to an improper partial line-item veto of provisions in the appropriation bill specifically funding the clinic. Finally, they claim that the downsizing plan is unconstitutional because it amounts to a reduction in appropriations without approval of the appropriating committees of the House and Senate.

Defendants respond by noting that the first sentence of art 5, § 20 provides that no appropriation is a mandate to spend. Defendants argue that appropriations only set the outer limits for spending, leaving it to the Governor in his discretion to determine how much needs to be spent to achieve the statutory goal. Defendants argue that DMH is given great discretion in the Mental Health Code with regard to patient levels at facilities, as well as their structure and function. Although conced-

ing that the Mental Health Code singles out the Lafayette Clinic for special attention, defendants contend they have not ignored the statute, but, rather, have exercised their discretion in executing the law within the parameters of the statute. They contend that there was no need to seek approval from the appropriations committees because no change in the amount *appropriated* to Lafayette Clinic was sought. Instead, defendants are merely restructuring the operations of Lafayette Clinic, as well as other mental health facilities, in order to achieve economies and efficiencies and thereby deliver services at lower cost, thus saving a portion of the amount appropriated for such purposes.

We agree with the circuit court that plaintiffs have shown a substantial likelihood of success on the merits of their constitutional claims. We reach this conclusion for the following reasons.

The Legislature enacts laws and appropriates funds. The executive branch of the government executes the laws and spends appropriated funds for designated purposes. Although the executive branch possesses a certain amount of discretion, it may not under the guise of executing the laws frustrate the Legislature's intent. *Kendall v United States,* 37 US (12 Pet) 524, 613; 9 L Ed 1181 (1838). The executive branch possesses no inherent constitutional power to decline to spend in the face of a clear legislative intent and statutory directive to do so. However, where funds are not explicitly earmarked and the executive branch is not specifically required to provide services out of those funds, the Governor may exercise discretion in distributing appropriated funds within a given department. *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v Donovan,* 241 US App DC 122, 128-130; 746 F2d 855 (1984).

In this case, the Legislature in 1991 PA 122 appropriated over $1.3 billion for the Department of Mental Health and singled out specific institutions, including Lafayette Clinic, for specific appropriations. This constitutes a clear indication of the Legislature's intent. Even if specific appropriations for other institutions are considered as nothing more than an expression of legislative preference, the specific appropriation for Lafayette Clinic must be viewed in the context of its special statutory status as an institution that DMH is required to operate. We conclude that defendants exceeded their discretion and constitutional authority by ignoring the clear legislative intent and statutory directive to spend.

We also agree with the circuit court that plaintiffs are likely to prevail on their claim that defendants' actions cannot be justified under art 5, § 20. The first sentence of that section, "No appropriation shall be a mandate to spend," is "intended to cover situations in which unforeseen efficiencies and economies might become possible." 2 Official Record, Constitutional Convention 1961, p 3381. For example, the occurrence of an unforeseen mild winter might result in savings of funds appropriated for snow removal, and the first sentence of art 5, § 20 makes clear that the executive branch is not required to spend such funds unnecessarily simply because they were appropriated by the Legislature.[1] However, defendants cannot justify reducing expenditures of funds appropriated for Lafayette Clinic because of "unforeseen efficiencies and economies." Defendants have not challenged on appeal the circuit court's finding of fact that the economies and efficiencies justifying the December 4, 1991, downsizing plan were the same

[1] We are indebted to counsel for the union for suggesting this example at oral argument.

economies and efficiencies identified in January 1991. These economies and efficiencies cannot have been unforeseen when the Governor signed the mental health appropriation bill in October 1991, which contained specific appropriations for Lafayette Clinic. Therefore, defendants cannot justify ignoring the Legislature's mandate to spend pursuant to the first sentence of art 5, § 20.

Defendants have not argued that expenditure of funds appropriated for Lafayette Clinic must be reduced because it appears that actual revenues will fall below revenue estimates. For this reason, and because defendants have not obtained approval from the appropriations committees, the second sentence of art 5, § 20 is not applicable.

Defendants note that the third sentence of art 5, § 20 requires that reductions in expenditures "be made in accordance with procedures prescribed by law." Section 372(4) of the Management and Budget Act, MCL 18.1372(4); MSA 3.516(372)(4), provides:

> Allotments may be reduced or adjusted by the state budget director as a result of implementing measures of administrative efficiency, including the abolishment of positions by appointing authorities. An action taken under this section shall be reported to the appropriations committees within 15 days after the action is taken.

Defendants argue that their actions comport with art 5, § 20 because the executive branch is empowered by the Legislature to reduce allotments pursuant to § 372(4).

We reject defendants' argument for the following reasons. This Court has previously held that the Legislature intended the Management and Budget Act to occupy the whole field of the budget process. *House Speaker v State Administrative Bd,*

190 Mich App 260, 274; 475 NW2d 440 (1991). At issue in *House Speaker* were provisions of the act that provide mechanisms for adjusting mismatched appropriations and expenditures. *Id.* at 272. We now hold that those provisions are the "procedures prescribed by law" to implement the second sentence of art 5, § 20, and that § 372(4) of the Management and Budget Act implements the first sentence's directive that appropriated funds need not be spent. For this reason, we further hold that § 372(4) should be interpreted to require that the administrative efficiencies identified by the state budget director be "unforeseen" within the meaning of the first sentence of art 5, § 20.

Finally, we also agree that plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that defendants' downsizing plan would amount to a partial line-item veto of the specific appropriations for Lafayette Clinic. The Governor's veto power, embodied in art 5, § 19, is modeled on Const 1908, art 5, § 37, which did not empower the Governor to reduce or modify any specific item in an appropriation bill. The Governor must either accept a line item or veto it. *Wood v State Administrative Bd,* 255 Mich 220, 223-225; 238 NW 16 (1931).

For these reasons, we conclude that plaintiffs have shown a substantial likelihood of success on the merits of their constitutional claims.

III

Plaintiffs claim that the downsizing plan violates §§ 900, 902, and 904 of the Mental Health Code. They argue that a downsized clinic could not carry out the functions required by these sections, and that the contract with WSU to conduct research at the clinic violates the mandate of § 902 that the

director of the clinic have complete supervision and control of the operation and personnel of the clinic.

Defendants argue that although the clinic director's supervision and control might be reduced under the downsizing plan, they remain consistent with the functions performed by directors of other mental health facilities. Defendants argue that the director continues to exercise complete supervision and control of the operation and personnel *of the clinic,* although certain operations formerly performed by clinic personnel are now performed by WSU personnel, e.g., research. Defendants note that § 904 only requires the clinic to conduct a program including both inpatient and outpatient services, while otherwise authorizing DMH to establish at the clinic a training and research program. Defendants argue that § 904 is not violated by the downsizing plan because the clinic continues to provide both inpatient and outpatient services, albeit at a reduced level.

We agree with the circuit court that plaintiffs have shown a substantial likelihood of success on the merits of their statutory arguments for the following reasons.

Section 904 allows, but does not require, DMH to establish training and research programs at the Lafayette Clinic. If such programs are established, however, the director of the clinic must have "complete supervision and control" of them, inasmuch as § 902 does not distinguish between required and permissible programs at the clinic. To the extent that defendants' contract with WSU reduces the director's supervision and control of the operation and personnel of the clinic, it violates § 902.

Section 900 requires DMH to maintain "a psychiatric hospital and outpatient clinic known as La-

fayette clinic." The last sentence of § 904 provides that the clinic "shall conduct a program which includes both an inpatient and outpatient service for those in need of psychiatric care and treatment." Section 908(2) provides:

> The department, in order to facilitate the conducting of training and research programs, shall promulgate rules or adopt policies controlling the number and type of patients to be admitted to the clinic. The department may, as it deems advisable, promulgate or adopt such other rules or policies which regulate admission and are consistent with the provisions of this act or other provisions of law, and required by rules and policies.

Section 908(2) clearly gives DMH the power to control the number and type of patients at the clinic in order to facilitate any training and research programs established at the clinic. DMH also has general statutory power to control the population at mental health facilities. However, this power is not absolute. The power to control the number and type of patients is limited in part by the requirement that the clinic include both inpatient and outpatient services, as defendants themselves recognize. Defendants' power is limited even further, inasmuch as the last sentence of § 904 requires the clinic to provide inpatient and outpatient service "for those in need of psychiatric care and treatment," and § 900 contemplates that the clinic function as a "psychiatric hospital and outpatient clinic." Because defendants' downsizing plan effectively restructures Lafayette Clinic into a research-only facility, it violates the legislative intent embodied in the mandatory provisions of §§ 900 and 904.

Although defendants are entitled to deference in the manner in which they carry out their statu-

tory mandates, and must be given wide discretion in the means chosen to provide the services required by statute, the downsizing plan goes too far and violates the legislative intent embodied in the Mental Health Code that Lafayette Clinic function as a psychiatric hospital providing both inpatient and outpatient services. The intent of the Legislature was reaffirmed in the specific appropriations for an eighty-one-bed facility at Lafayette Clinic in 1991 PA 122.

IV

The circuit court made the following findings of fact. On January 29, 1992, fifty-two union-represented employees of the clinic received layoff notices that stated that they were being laid off because their positions were abolished. On January 31, 1992, twenty additional union-represented employees received layoff notices that stated that the reason for layoff was "lack of funds and/or reduction in spending authorization." The union filed a grievance challenging the layoffs, and also filed a grievance challenging the transfer of research activities from the clinic to WSU, allegedly in violation of the subcontracting clause of the parties' collective bargaining agreement. The court found that there was probable merit to both grievances and concluded that the union had shown a substantial likelihood of success on the merits of its contractual claims.

Defendants have not responded to the merits of the contractual claims, but, rather, argue that the economic losses to which union-represented employees are exposed are not the sort of irreparable harm that would justify granting an injunction. We agree. Economic injuries are not irreparable because they can be remedied by damages at law.

*Acorn Building Components, Inc v UAW Local 2194,* 164 Mich App 358, 366; 416 NW2d 442 (1987). In addition, it is generally not proper for a circuit court to use a preliminary injunction to reinstate a terminated employee, or to prevent the layoff of an employee, pending the exhaustion of the employee's grievance remedy. *Michigan State Employees Ass'n, supra.*

However, we also agree with the union that an injunction in aid of arbitration is appropriate in this case to preserve the status quo and prevent any award by the arbitrator in favor of the union from being rendered a nullity.

This Court has long held that a preliminary injunction may be appropriate in aid of the jurisdiction of the Michigan Employment Relations Commission when a party to a collective bargaining agreement files unfair-labor-practice charges regarding, for example, alleged improper subcontracting that would become irrevocable and beyond the power of MERC to remedy in the absence of an injunction. *Van Buren Public School Dist v Wayne Circuit Judge,* 61 Mich App 6, 17; 232 NW2d 278 (1975). In addition, the United States Supreme Court has held that an injunction may be appropriate in aid of arbitration, at least in cases involving compulsory arbitration under the Railway Labor Act, 45 USC 151 *et seq. Brotherhood of Locomotive Engineers v Missouri-K-T R Co,* 363 US 528; 80 S Ct 1326; 4 L Ed 2d 1379 (1960).

Under the circumstances of this case, where the power of an arbitrator to fashion a remedy in the event the grievances are upheld might be frustrated in the absence of a preliminary injunction, and where plaintiffs in the companion case have demonstrated irreparable harm in the absence of an injunction (see part V *infra*), we hold that the

circuit court did not err in granting the union's request for an injunction in aid of arbitration.

V

The circuit court found as fact that several of the individual plaintiffs in Docket No. 150367 suffered a deterioration in their condition when discharged pursuant to the downsizing plan, but have stabilized after they were readmitted to Lafayette Clinic pursuant to the mandates of temporary restraining orders. The circuit court also found that several of the plaintiffs threatened with discharge under the downsizing plan would probably experience a worsening of their condition, given the present condition of the mental health system in this state and given Lafayette Clinic's expertise in dealing with the hard-to-treat mental health patient. Defendants have not demonstrated that these findings of fact are clearly erroneous. MCR 2.613(C). On the basis of these findings, we hold that the circuit court did not err in concluding that plaintiffs in Docket No. 150367 demonstrated likely irreparable harm in the absence of an injunction.

Defendants complain that the injunction is too broad, noting that this is not a class action, and contending that any injunction should be limited to those individual plaintiffs who actually demonstrated probable irreparable harm. Defendants did not, however, challenge the standing of plaintiff Mental Health Association of Michigan to seek injunctive relief on behalf of its membership, which is comprised of mental health services consumers, family members of mental health patients, providers of mental health services, and mental health advocacy groups. Moreover, given the nature of the constitutional and statutory claims

made by plaintiffs, we do not believe that the injunctions are too broad.[2]

## VI

We conclude that plaintiffs have shown a substantial likelihood of success on the merits of their constitutional and statutory claims. We also find a significant likelihood of irreparable harm to plaintiffs in the absence of the injunctions. Because the likely harm to plaintiffs in the absence of the injunctions outweighs any harm to defendants if the injunctions are allowed to stand, and because the public interest is not harmed by the injunctions, we affirm the decision of the circuit court.

Affirmed.

---

[2] We note that the injunctions require defendants to continue the training and research functions of Lafayette Clinic as they existed before December 4, 1991. Training and research at the clinic are authorized by statute, but are not mandated. Because defendants have not challenged this provision in the injunctions, we express no opinion regarding its propriety.