DETROIT FIRE FIGHTERS ASSOCIATION v CITY OF DETROIT

Docket No. 96430. Argued May 2, 1995 (Calendar No. 7). Decided
    August 15, 1995. Rehearing denied 450 Mich 1215.

Detroit Fire Fighters Association and certain member-officers
    brought an action in the Wayne Circuit Court against the City
    of Detroit, the mayor, and others, seeking mandamus to compel
    expenditure by the city of monies appropriated by the city
    council for a new fire department squad. The court, Sharon
    Tevis Finch, J., ruled that the plaintiffs had standing, but
    granted summary disposition for the defendants, holding that
    the mayor was not required to consult with the city council
    before deciding not to spend appropriated funds. The Court of
    Appeals, TAYLOR, P.J., and BRENNAN, J. (MARILYN KELLY, J.,
    dissenting), reversed on the issue of standing, finding that the
    plaintiffs did not assert particularized injuries to distinguish
    them from the general public to such a degree that standing
    would be conferred against a public body and public officials,
    and affirmed the grant of summary disposition (Docket No.
    128335). The plaintiffs appeal.

    In separate opinions, the Supreme Court reversed the judg-
    ments of the Court of Appeals regarding standing and sum-
    mary disposition.

    Justice WEAVER stated that the collective bargaining unit of
    fire fighters does not have a sufficiently real and adverse
    interest separate from the general public to confer standing.

    Standing is a legal concept that focuses on whether the
    litigant's interest will ensure sincere and vigorous advocacy.
    Simply demonstrating an ability to vigorously advocate does
    not confer standing; rather, the plaintiff must demonstrate that
    a substantial interest will be affected detrimentally in a man-
    ner different from the public at large. The plaintiffs' member-
    ship in the fire fighters union does not provide standing to sue
    the defendants. The harm claimed by them is no different than
    what would be suffered by the general public.

    Neither the Detroit City Charter nor the UBAA grant the
    mayor express authority to refuse to spend monies appropri-
    ated by the city council for a specific purpose, and the charter
    permits two methods by which to amend the budget after its
    adoption, neither of which were complied with in this case. To

amend the budget, the mayor must invoke either § 8-210, addressing surpluses in revenues or public emergency, or § 8-211, addressing transfers of appropriations that may be made by the council upon written request of the mayor, each of which requires the joint action of the mayor and the council. Thus, the charter contemplates a separation of powers between the executive and the legislative branches in addressing budgetary concerns. Just as the city council cannot make unilateral changes in the budget, the mayor cannot single-handedly alter the city council's appropriations. To allow the mayor such power would provide a means for circumventing the legislative branch and essentially render meaningless the powers and duties granted to the city council by charter. Additionally, although the executive branch is granted some discretion in the expenditure of appropriated funds, it possesses no inherent constitutional power to refuse to spend in the face of clear legislative intent and statutory directive.

Justice RILEY, joined by Chief Justice BRICKLEY, concurring, stated that the plaintiffs do not have standing to enforce or compel express or implied charter provisions directed at preserving a balance of power between the executive and legislative branches because they are not in the zone of interest protected by the charter provisions, i.e., not in the class of persons for whom the charter conveys an especial benefit, and, hence, are not proper parties to seek enforcement of these separation of powers issues. The budgetary constraints or procedures placed on the mayor by charter were directed at benefiting the council and the public, generally, through a check on abuse; they were not intended to especially benefit the fire fighters.

The mayor's unilateral impoundment of this appropriation was illegal because it frustrated the intent of the appropriation to create an additional fire squad. While the mayor is not required to spend the entire appropriation, he cannot unilaterally frustrate the underlying purpose of it. If the mayor desired to amend the budget, he was required to seek council approval consistent with the charter provisions.

Justice CAVANAGH, joined by Justice BOYLE, dissenting in part and concurring in part, stated that the plaintiffs have established standing. The mayor exceeded his executive discretionary power when he refused to spend any of the appropriated funds, completely thwarting the stated purpose of the appropriation and violating the separation of powers doctrine.

An appropriation is not a mandate to the executive branch to spend the full appropriation. While the executive branch has

inherent discretion, if not a duty, to seek economic savings, this discretion may not extend so far as to usurp legislative authority. Adopting a budget is a legislative function. Proposing and implementing a budget are executive functions. If the executive branch has substantially accomplished the stated purpose of an appropriation, it has legally operated within executive discretionary authority when it economically saves money by not spending the full amount. However, if the effect of the not spending frustrates or thwarts the stated purpose, the executive branch has not executed or implemented a legislative authorization, but, instead, has unilaterally adopted its own budget by deviating from, if not ignoring, the council's budget. A de facto deviation from the budget, which, in effect, is a postadoption amendment of the budget, requires joint action of the mayor and of the city council under UBAA, § 17, and under Detroit Charter §§ 8-210, 8-211.

Justice MALLETT, joined by Justice LEVIN, concurring only in the result, stated that the plaintiffs should be granted standing because they are clearly affected by the subject matter of the substantive claim in a manner and degree different than the general public. However, because an appropriation is not a mandate to spend, the mayor is not required to spend appropriated funds when exercising executive authority to operate within the budget.

199 Mich App 129; 501 NW2d 202 (1993) reversed.

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Theodore Sachs, Mark Brewer,* and *Reginald M. Turner, Jr.*), for the plaintiffs.

City of Detroit Law Department (by *Phyllis A. James,* Corporation Counsel, and *Joanne D. Stafford,* Supervising Assistant Corporation Counsel, and *Terri L. Renshaw*) for the defendants.

WEAVER, J. We are asked to determine, first, whether plaintiff Detroit Fire Fighters Association and its named member-officers have standing to challenge an alleged violation of the Detroit City Charter and, second, whether the executive branch of Detroit city government may unilaterally impound budget monies. We would hold that the collective bargaining unit of fire fighters does not

have a sufficiently real and adverse interest separate from the general public to confer standing in this action. On the basis of our finding of lack of standing, we would vacate the decision of the Court of Appeals regarding the second issue, and affirm with respect to the standing issue.

I

In 1989, Mayor Coleman Young submitted a written budget proposal to the Detroit City Council. The city council amended the budget to include $750,000 for a new fire department squad, whose purpose was to provide reserve manpower and to engage in certain specialized functions, such as rescue, extrication, and transport. The city council passed the amended budget, but the mayor vetoed $500,000 of the $750,000 appropriated. By a vote of eight to one the council overrode the mayoral veto, reinstating the original $750,000 appropriation. The mayor never authorized the use of the appropriation.

A number of demands were made by plaintiffs that the appropriated funds be spent, but the demands were ignored. Plaintiffs filed suit in circuit court, originally seeking injunctive relief, but later requesting a writ of mandamus to compel defendants to spend the money. During the parties' hearing on cross motions for summary disposition, the trial court ruled that plaintiffs had standing, but that the defendants were entitled to summary disposition because the mayor was not required to consult with the city council before deciding not to spend appropriated funds.[1]

---

[1] The trial court stated, "it seems to me that the Mayor and the City are not acting outside their authority in administering the budget as they do and I do not believe that they need to go back to Council to have Council concur when they do not spend the money."

Both parties appealed. The Court of Appeals reversed the decision of the trial court on the issue of standing, finding that plaintiffs did not assert particularized injuries to distinguish them from the general public to such a degree that standing would be conferred against a public body and public officials. 199 Mich App 129; 501 NW2d 202 (1993). The Court of Appeals then addressed the substantive issues, stating in a footnote that "although they are now moot, . . . they are of public significance and are likely to reoccur," *id.* at 131, n 1, affirming the trial court ruling that the mayor was "not required to spend the money appropriated for hiring additional fire fighters." *Id.* at 133. We then granted leave to appeal.[2]

II

Standing is a legal concept that focuses on whether the litigant's interest will ensure sincere and vigorous advocacy. Simply demonstrating an ability to vigorously advocate does not confer standing. Rather, demonstration that a substantial interest of the litigant will be detrimentally affected in a manner different from the public at large must be shown. *Alexander v Norton Shores,* 106 Mich App 287, 288; 307 NW2d 476 (1981). Standing does not address the ultimate merits of the substantive claims of the parties.[3]

There appears no quarrel that plaintiffs would have vigorously and sincerely advocated their

Regarding the issue of standing, the trial court ruled, "I believe that the plaintiffs have the right to standing to bring this lawsuit, but I don't believe the lawsuit itself is entitled to succeed."

[2] 447 Mich 987 (1994).

[3] Standing is a jurisdictional issue that concerns the power of a court to hear and decide a case and does not concern the ultimate merits of the underlying substantive issues of the action. *Weiner v Bank of King of Prussia,* 358 F Supp 684, 695 (ED Pa, 1973).

cause, and the record would support that position. Where the parties disagree is on plaintiffs' claim of standing based on membership in the fire fighters union, and in plaintiffs' reliance on the ruling in *Muskegon Bldg & Construction Trades v Muskegon Area Intermediate School Dist,* 130 Mich App 420; 343 NW2d 579 (1983).

The five individually named plaintiffs also claim residency in the City of Detroit, in addition to their union membership and status as employees of the city. However, plaintiffs' status as city employees or Detroit residents provides them with no greater interest in these proceedings than the thousands of other city employees or millions of city residents. It is well settled that all disgruntled citizens do not automatically have standing to sue a public body. "Traditionally, a private citizen has no standing to vindicate a public wrong or enforce a public right where he is not hurt in any manner differently than the citizenry at large." *Waterford School Dist v State Bd of Ed,* 98 Mich App 658, 662; 296 NW2d 328 (1980).

Likewise, plaintiffs' membership in the fire fighters union does not singularly anoint them with standing to sue the defendant. Obviously the fire fighters union would like to see additional members added to their rosters, as undoubtedly would the police union, the clerical union, and the maintenance workers union, but this is not a sufficient interest to confer standing. In *Saginaw Fire Fighters Ass'n Local No 422 v Police & Fire Dep't Civil Service Comm,* 71 Mich App 240; 247 NW2d 365 (1976), the Saginaw fire fighters union and the union president filed suit against the Saginaw Police and Fire Department Civil Service Commission seeking an injunction, preventing the commission from exercising a waiver-of-residency requirement for new recruits that would have given

nonresidents an equal chance for the limited job opportunities. The Court held that the union demonstrated no special injury to its current membership and could not claim standing on the basis of speculative harm to future members. *Id.* at 244. In this case, none of the current Detroit fire fighters members lost their jobs as a result of the budget impoundment.

Plaintiff Detroit Fire Fighters Association alleged an increased risk of injury, emotional distress, and loss of morale and efficiency as a direct result of defendants' impoundment of budgeted monies. These allegations were supported by expert testimony offered by plaintiffs in an arbitration hearing, and offered as an appendix to plaintiffs' pleadings in these various proceedings.[4] It is these general, "inter alia" allegations on which plaintiffs rely to demonstrate that they will be detrimentally harmed in a manner different from the citizenry at large.[5] These general allegations of harm, coupled with their membership in a trade organization, cause plaintiffs to believe they are

---

[4]    Plaintiffs' expert, John Devine, is a former fire fighter and officer in the Washington D.C. Fire Department. Mr. Devine based a number of his statements on his perusal of a bulletin prepared in 1971 by the Detroit Fire Commission which recommended "squad companies," such as those included in the budgeted monies at issue in the instant case. Mr. Devine agreed with the statement from the Fire Commission bulletin that adding squad companies, i.e. adding additional fire fighters, "would reduce the workload on the fire fighters."

[5] Plaintiffs' alleged in their complaint that they would suffer "irreparable injury including, inter alia, increased risk of death and risk of serious physical injury; risk of serious emotional distress; and harm to morale and efficiency of plaintiff DFFA's members . . . ." See *Kaminskas v Detroit*, 68 Mich App 499; 243 NW2d 25 (1976), in which the Court held that broad-gauge, conclusory, "inter alia" allegations, without particularized assertions injuries in fact are not sufficient to confer standing in an action against public bodies and public officials. See also *Menendez v Detroit*, 337 Mich 476; 60 NW2d 319 (1953), in which the Court held that mere allegations of injury without specific facts showing actual injury or damage will not confer standing.

entitled to standing under *Muskegon Bldg & Con-struction Trades v Muskegon Area Intermediate School Dist, supra.* Plaintiffs' belief is misplaced.

In *Muskegon Trades,* the plaintiffs were an asso-ciation of trade organizations who filed suit to prevent the defendant school district from receiv-ing bids or awarding contracts that did not require payment in conformity with the prevailing wage act. The plaintiffs argued that although their members did not have a right to be awarded the bids or contracts, substantial numbers of these workers would be affected differently than the general public in that many would receive jobs on the school project, and would be paid at less than prevailing wages. The defendant school district impliedly conceded that the plaintiffs would be harmed in a manner different from the general public when it did not raise the argument as an issue to standing.[6] Instead, the school district raised three other arguments against plaintiffs having standing: that as an association of trade organizations plaintiffs were incapable of being employed,[7] that the associations' statements of corporate purpose did not indicate they were formed to act as class representatives in litigation,[8] and that none of the individual members of the organizations had a right to a job on the defen-

[6] MCR 2.111(F)(2). Defenses must be pleaded.

[7] Defendant relied on *White Lake Improvement Ass'n v City of Whitehall,* 22 Mich App 262, 271-274; 177 NW2d 473 (1970), in which the Court of Appeals held that although the association itself owned no property that was affected by the alleged nuisance, the sole purpose of the association was to represent the interests of its members, many of whom were riparian landowners on the subject lake.

[8] Defendant school district cited *Michigan Licensed Beverage Ass'n v Behnan Hall, Inc,* 82 Mich App 319; 266 NW2d 808 (1978), in which the Court of Appeals found that the association's statement of corpo-rate purpose did not indicate that it was formed to act as a class representative in litigation, and thus could not assume that role.

dant's project.[9] The Court in *Muskegon* found none
of the school district's arguments persuasive, and
held that the trade organization did demonstrate
an adverse effect, separate from the general public,
specifically, if the prevailing wage act was upheld,
substantial numbers of the association's members
would receive jobs on the school district building
project. This was distinctly and wholly separate
from any interest of the general public.

Defendants, on the other hand, believe the ap-
pellate decision in *Rayford v Detroit,* 132 Mich
App 248; 347 NW2d 210 (1984) is controlling. In
*Rayford,* plaintiff police officers attempted to bring
suit under the UBAA after they lost their jobs as a
result of a budget cutback instituted by the mayor
without prior city council approval. The Court
held that the purpose of the UBAA was "to promote
uniform budgets and avoid deficit spending, not to
afford security of employment," *id.* at 257, and
found that plaintiffs lacked standing to sue under
the UBAA. Though this reasoning is persuasive, it
is not controlling. Factually the cases are dissimi-
lar in that the instant case involves the Detroit
City Charter, not the UBAA. Where the UBAA was
designed exclusively to aid municipalities in their
accounting, the Detroit City Charter is a very
broad document, favoring a "strong mayor" form
of government, and encompassing the "comprehen-
sive home rule power conferred upon it by the
Michigan Constitution . . . ." Detroit Charter, art
1, § 1-102. The potential areas of conflict that could
arise under the charter, and that could conceiv-
ably injure a private individual in a manner differ-
ent from the general public are not so remote as to

---

[9] Defendant school district's authority was *Kaminskas v Detroit,
supra,* in which associations representing city employees sought an
injunction to prevent the city from hiring provisional employees,
allegedly in violation of the city charter. The Court held that the
associations failed to allege a specific injury to any of their members.

be easily disposed of by this Court. The key inquiry should be whether the individual can show injury distinct from the general citizenry.

Contrast the harm suffered by plaintiffs in *Muskegon Trades* with one presently before the Court. Plaintiff fire fighters allege that they will suffer increased risk of death and risk of serious physical injury.[10] As the Court of Appeals noted:

> [T]his increased likelihood of physical injury is not unlike the general public's increased likelihood of physical injury due to the lack of fire fighters. That is, it is more likely that a fire fighter who fights two hundred fires annually will be hurt than the same fire fighter who fights one hundred fires annually if only because that fire fighter is more often put at risk. But people occupying buildings that catch on fire are more likely to be injured when there are fewer fire fighters available to put out the fires. Both segments of society are at greater risk when there is a dearth of fire fighters. [199 Mich App 132-133.]

Though plaintiffs protest to this Court that the appellate ruling is an "extraordinary assertion" of probabilities, it is a logical one. We find that the harm claimed by plaintiffs is no different than that to be suffered by the general public.

III

Although the plaintiffs have no standing to bring this action, we choose to address the substantive issue presented because it is significant to the public and likely to reoccur. *In re Ford*, 187

---

[10] Interestingly, none of the pleadings indicate any specific instances of increased death, injury, emotional distress or loss of morale and efficiency, despite the passage of almost one year from the time the monies were impounded and the plaintiffs' motion for summary disposition was heard by the trial court. The pleadings were amended once, in the interim, but not to include additional allegations of harm.

Mich App 452, 454; 468 NW2d 260 (1991). There-
fore, we will consider whether the executive
branch of the Detroit city government may unilat-
erally impound $750,000 appropriated by the De-
troit City Council for an additional fire squad.

Generally, a mayor has only that authority
which is expressly or impliedly conferred upon
him by charter or by the council acting within the
scope of the charter. 3 McQuillin, Municipal Cor-
porations (3d ed rev), § 12.43, p 249. Neither the
Detroit City Charter nor the UBAA grant the
mayor express authority to refuse to spend monies
appropriated by the city council for a specific
purpose. "[T]he common council of the city of
Detroit [and likewise the mayor] must act strictly
within the powers granted to it in the charter."
*Thompson Scenic R Co v McCabe,* 211 Mich 133,
139; 178 NW 662 (1920).

Appropriations generally cannot be diverted to
any other purpose except as provided by statute or
charter. 15 McQuillin, Municipal Corporations (3d
ed rev), § 39.69, p 233. The Detroit City Charter
permits two methods by which to amend the
budget after its adoption, neither of which were
complied with here. *Detroit City Council v Stecher,*
430 Mich 74, 83; 421 NW2d 544 (1988). Section
8-210 addresses amendments made because of sur-
pluses in revenues or public emergency.[11] Section

_____

[11]   Sec. 8-210. Amendments after adoption.

  1. If during the fiscal year the mayor advises the city council
that there are available for appropriation revenues in excess of
those estimated in the budget, the city council may make
supplemental appropriations for the year up to the amount of
the excess.

  2. To meet a public emergency affecting life, health, property
or the public peace, the city council may make emergency
appropriations. To the extent that there are no available un-
appropriated revenues to meet those appropriations, the city
council may authorize the issuance of emergency notes as
provided by law, this charter or ordinance.

8-211 concerns transfers of appropriations that may be made by the council upon written request of the mayor.[12] To amend the budget, the mayor must invoke either of these sections, both of which require the joint action of the mayor and the Detroit City Council.[13]

Thus, the Detroit City Charter contemplates a separation of powers between the executive branch —the mayor—and the legislative branch—the city council—in addressing budgetary concerns. In *Stecher, supra,* the Court recognized the separation of powers set forth in the charter as not being inconsistent with the UBAA and precluded the city council from unilaterally amending the mayor's proposals to effectuate a balanced budget. *Stecher, supra* at 90. Just as the city council cannot make unilateral changes in the budget, the mayor cannot single-handedly alter the city council's appropriations. To allow the mayor such power would provide a means for circumventing the legislative branch and essentially render meaningless the powers and duties granted to the city council by charter.

Additionally, although the executive branch is granted some discretion in the expenditure of appropriated funds, it possesses no inherent constitutional power to refuse to spend in the face of clear legislative intent and statutory directive. *Int'l Union, United Automobile, Aerospace & Agri-*

---

[12] Sec. 8-211. Transfer of appropriations.

At any time during the fiscal year upon written request by the mayor, the city council may, by resolution, transfer all or part of any unencumbered appropriation balance among the programs, services or activities within an agency or from one agency to another.

[13] Even if amending the budget for deficit reduction purposes, the mayor must still seek council approval under the city charter as well as the UBAA. *Detroit City Council v Detroit Mayor,* 202 Mich App 353, 355; 509 NW2d 797 (1993).

*cultural Implement Workers of America, UAW, Local 6000 v Michigan,* 194 Mich App 489, 501; 491 NW2d 855 (1992).[14] Here, the city council clearly earmarked $750,000 of the appropriation to be used to fund an additional fire squad.[15] Thus, the mayor may not use discretion as a guise for frustrating this intention. *Id.*

### CONCLUSION

For the reasons stated, we would affirm the decision of the Court of Appeals with regard to the issue of standing and would reverse and remand on the substantive issue.

RILEY, J. I concur with the lead opinion's conclusion that plaintiffs lack standing, albeit for different reasons. I believe plaintiffs lack standing because of the budgetary issues they wish to enforce. Plaintiffs claim that the mayor violated the Detroit City Charter by impounding and not appropriating funds for an additional fire squad. They contend that the only means for the mayor to avoid the appropriation[1] is through the amendment procedures set forth in charter §§ 8-210[2] and

[14] In *Int'l Union,* the Court of Appeals held that the Governor could not refuse to spend funds that had been specifically appropriated to the Department of Mental Health for Lafayette Clinic. *Id.* at 501-502.

[15] Defendant argues that when the city council reorganized all appropriations to the fire department and renumbered the appropriation entitled "Fire Fighting Division Operations," it failed to earmark any part of the appropriation as designated for an additional fire squad. The city council, however, never changed the amount allocated to "Fire Fighting Division Operations"; it only changed the number given to the appropriation from 0064 to 0718. Thus, it remains clear that the council intended $750,000 of the appropriation to be used for an additional fire squad.

[1] Plaintiffs contend that an appropriation, once adopted, "shall be of full force and effect." Section 8-208.

[2]    1. If during the fiscal year the mayor advises the city council that there are available for appropriation revenues in excess of

8-211.[3] By not following the amendment procedures, plaintiffs maintain that the mayor's actions were illegal and, thus, subject to injunctive or declaratory relief for appropriation of the money.

I am persuaded, however, that plaintiffs do not have standing to enforce or compel express or implied charter provisions directed at preserving a balance of power between the executive and legislative branches. Plaintiffs are not in the zone of interest protected by the charter provisions, i.e., not in the class of persons for whom the charter conveys an especial benefit, and, hence, are not proper parties to seek enforcement of these separation of powers issues. The budgetary constraints or procedures placed on the mayor by charter were directed at benefiting the council and the public, generally, through a check on abuse. They were not intended to benefit the fire fighters, even though the actual appropriation would have benefited them. In other words, the harm intended to be avoided by the charter was not to ensure that a department would be appropriated money, but to ensure that the stern mayoral control afforded by the charter was at least checked by the legislative branch of city government. Plaintiffs do not suffer that type of injury.

those estimated in the budget, the city council may make supplemental appropriations for the year up to the amount of the excess.

2. To meet a public emergency affecting life, health, property or the public peace, the city council may make emergency appropriations. To the extent that there are no available unappropriated revenues to meet those appropriations, the city council may authorize the issuance of emergency notes as provided by law, this charter or ordinance.

[3] At any time during the fiscal year upon written request by the mayor, the city council may, by resolution, transfer all or part of any unencumbered appropriation balance among the programs, services or activities within an agency or from one agency to another.

This conclusion notwithstanding, I reluctantly would reach the substantive issue because it is capable of repetition, yet evading review. In doing so, I would conclude that the mayor's unilateral impoundment of this appropriation was illegal because it frustrated the intent of the appropriation to create an additional fire squad. The mayor is not required to spend the entire appropriation, but he cannot unilaterally frustrate the underlying purpose of it.

I

Unlike constitutional cases in federal courts, the Michigan standing requirements are based on prudential rather than constitutional concerns. See, generally, *House Speaker v State Administrative Bd,* 441 Mich 547, 559 and n 20; 495 NW2d 539 (1993). In most cases, the concept of standing is "used to denote the existence of a party's interest in the outcome of litigation that will ensure sincere and vigorous advocacy." *Id.* at 554. However, mere assurances of vigorous advocacy are not sufficient. The plaintiff must also demonstrate that his substantial interest will be adversely affected in a manner distinct from the citizenry at large, i.e., an actual injury or likely chance of immediate injury different from the public.[4] *Id.* See also *House Speaker v Governor,* 443 Mich 560, 572; 506 NW2d 190 (1993). If the plaintiff's interest or interests are no different from those of the public, then we generally preclude suit.

In most cases, this basic public/private injury

---

[4] To have a personal interest in the outcome of litigation, a person alleging standing can demonstrate either that he has been injured or that he represents a person or a group of persons who have been injured. See *Inglis v Public School Employees Retirement Bd,* 374 Mich 10, 12-13; 131 NW2d 54 (1964); *Kaminskas v Detroit,* 68 Mich App 499; 243 NW2d 25 (1976).

focus is the dispositive inquiry, but that is not always the case. In determining whether a party has standing, it is proper to review the connection between the plaintiff's status and the claim sought to be adjudicated. See *Flast v Cohen,* 392 US 83, 102; 88 S Ct 1942; 20 L Ed 2d 947 (1968). Although not always an issue decided in each case,[5] both Michigan and federal jurisprudence require a review of whom the statutory or constitutional provisions at issue are designed to protect. If they were merely intended to protect the public, the plaintiff lacks standing to sue in a private cause of action for their violation. In such a case, the plaintiff does not suffer the type of injury the law was designed to protect.

As far back as 1881, Michigan cases have held that when a violation of a public duty is claimed, a private suit is generally precluded, but if the public duty also was intended to benefit private individuals, a private action can be maintained. *Taylor v Lake Shore & Michigan Southern R Co,* 45 Mich 74, 77; 7 NW 728 (1881). Justice COOLEY, writing for the Court, explained that "[t]he nature of the duty and the benefits to be accomplished through its performance must generally determine whether it is a duty to the public in part or exclusively, or whether individuals may claim that it is a duty imposed wholly or in part for their especial benefit." *Id.* See also *Gardner v Wood,* 429 Mich 290; 414 NW2d 706 (1987).

Similarly, in *Rayford v Detroit,* 132 Mich App

[5] When a court reaches the inquiry whether the plaintiff's injuries are distinct from the public's, it is generally presumed or decided that the statutory or constitutional provisions implicated were designed to protect the plaintiff's interests. See, e.g., *Muskegon Bldg & Construction Trades v Muskegon Area Intermediate School Dist,* 130 Mich App 420; 343 NW2d 579 (1983) (in which it went unquestioned that the plaintiff trade union was in the class of persons intended to be benefited by the prevailing wage act. MCL 408.551 *et seq.;* MSA 17.256[1] *et seq.*).

248; 347 NW2d 210 (1984), the plaintiffs sought reinstatement after a layoff on grounds that the mayor unilaterally amended the budget in violation of the Uniform Budgeting and Accounting Act. MCL 141.421 *et seq.*; MSA 5.3228(21) *et seq.* Because the budgetary provisions were not enacted for their especial benefit, the Court concluded that the plaintiffs lacked standing. The Court analyzed the statute at issue in light of the plaintiff's status as a proper party, concluding that the statute was designed "to promote uniform budgets and to avoid deficit spending, not to afford security of employment." *Id.* at 257.

As both *Taylor* and *Rayford* illustrate, standing requires an analysis of the statutory or constitutional provisions to determine whether they were enacted for the benefit of the plaintiffs. Both cases conclude that when the statute or constitutional provisions were not intended to benefit or protect the plaintiffs, i.e., for their especial benefit, they lack standing to sue.

Federal courts have adopted similar principles as part of their prudential standing requirements. In some cases, the United States Supreme Court has employed what it deems as the "zone of interest" test and in other cases the "especial benefit" test. See *Clarke v Securities Industry Ass'n,* 479 US 388, 400-401, n 16; 107 S Ct 750; 93 L Ed 2d 757 (1987). Although both will preclude standing where the plaintiffs were not to be protected by the statutory or constitutional provisions, the stringency of application appears to be the determinative factor.

To illustrate, the Court in *Ass'n of Data Processing Service Organizations, Inc v Camp,*[6] explained the "zone of interest" test in terms of "whether

_____

[6] 397 US 150, 153; 90 S Ct 827; 25 L Ed 2d 184 (1970).

the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[7] Further explaining this test in *Clarke,* the Court stated that it "is not meant to be especially demanding" or require a finding of direct purpose to benefit the plaintiffs. *Id.* at 399. Instead, the test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

On the other hand, in *Cort v Ash,*[8] the Court employed more stringent requirements by asking whether the plaintiffs were "one of the class for whose *especial* benefit the statute was enacted." (Emphasis supplied.)[9] As intimated in *Clarke, su-*

---

[7] Most case law has considered whether a private cause of action is maintainable on the basis of a statutory provision. However, the United States Supreme Court has also utilized this analysis where a constitutional provision is alleged to be violated. See *Boston Stock Exchange v State Tax Comm,* 429 US 318, 320-321, n 3; 97 S Ct 599; 50 L Ed 2d 514 (1977) (the plaintiff stock exchanges have standing to assert that a state law tax on out-of-state sales is violative of the Commerce Clause because they are "arguably within the zone of interests" protected by the Commerce Clause).

[8] 422 US 66, 78; 95 S Ct 2080; 45 L Ed 2d 26 (1975).

[9] This requirement is the first of a four-part test. Failing any one of the requirements, however, requires a finding of no standing. The four-part test is as follows:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [*Id.* at 78. Emphasis supplied.]

*pra* at 400, n 16, the "zone of interest" test is the less demanding of the tests and usually limited to claims under the Administrative Procedure Act,[10] which "generous review provisions" warrant such a test. However, the *Clarke* Court noted that the threshold test is higher in non-APA cases, ostensibly because there is no statutory or constitutional provisions that confer generous review standards. *Id.* Hence, the test in non-APA cases is[11] not whether "their interests were arguably within the zone protected or regulated by" the statute, but whether the plaintiffs "were 'one of the class for whose *especial* benefit the statute was enacted . . . .' " *Id.* at 401, n 16 (emphasis supplied).

As cases from this Court and the United States Supreme Court illustrate, whether plaintiffs are in the zone of interest protected or in the class of persons intended to be benefited by the statutory or constitutional provisions is a central part of the standing requirements.[12] Regardless of the stringency of application, it is clear that invoking the protection of a statute, constitution, or, in this case, a city charter provision, should be done by those intended to be benefited by the provision. A person whose interest was not intended to be protected by the law lacks standing to sue. When

[10] See 5 USC 702.

[11] Some commentators have indicated that the zone of interest test is arguably limited to APA proceedings and then used only selectively by the Supreme Court. See 13 Wright, Miller & Cooper, Federal Practice & Procedure (2d ed), § 3531.7, pp 506-526, and 1995 supp, pp 314-334; Chemerinsky, Federal Jurisdiction, § 2.3, p 87. Others have further indicated that it is a corollary of the third party standing requirements. See Tribe, American Constitutional Law (2d ed), § 3-19, pp 144-145.

[12] Although not binding on Michigan courts, we noted in *House Speaker, supra,* that "Michigan courts previously have relied upon federal authority when deciding standing questions." *Id.* at 560, n 21. Regardless, the principle gleaned from the zone of interest and especial benefit tests is entrenched in Michigan law as a prudential standing requirement. Moreover, its application is implicated by the facts of this case.

faced with lack of standing, judicial self-restraint
is warranted.

II

In this case, the charter provisions alleged to be
violated are budgetary in nature. They address
how and when a budget can be amended and are
clearly directed at preserving a balance of power
between the executive and legislative branches of
city government. Although the public as a whole is
clearly a beneficiary of proper operation of these
procedures, that is not enough to confer standing.
Procedures designed to regulate the coordinate
branches of government do not directly affect the
rights of private individuals and, consequently,
were not intended for any one individual's especial
benefit.

As applied to this case, the budgetary con-
straints placed on the mayor by charter were
directed at benefiting the council and the public
generally, through a check on abuse. They were
not intended to benefit the fire fighters simply
because they may be beneficiaries of a budget
appropriation. The injury intended to be avoided
was an abuse of power, not the loss of an opportu-
nity for a specific group of persons to receive an
appropriation. Like the UBAA provisions at issue in
*Rayford, supra,* the charter provisions regarding
budgetary procedures were intended to create a
check on power and "to promote uniform budgets
and to avoid deficit spending, not to afford" the
security of an additional fire squad. *Id.* at 257.

Simply because the charter fails to designate a
specific party to file suit does not make the analy-
sis in *Rayford* distinguishable. The requirement
that a plaintiff assert an interest protected by the
statutory or constitutional provision is well en-

trenched in both Michigan and federal law. Because plaintiffs clearly do not fall within the class intended to be especially benefited by charter provision, I would find that plaintiffs lack standing.

III

Although I disagree with the analysis of the standing issue in the lead opinion, I reluctantly agree with all my colleagues that it is proper to reach the substantive merits of this appeal. While judicial self-restraint is an important principle, I believe that resolution of these important budgetary issues is necessary, given that swift action is needed when a *proper* party seeks to compel, if required by charter or statute, action during the budget year. As we know too well, climbing the appellate ladder during the budget year is unlikely and, thus, in all probability, will evade our review. "[W]here a controversy is ' "capable of repetition, yet evading review," ' " it is proper to reach the merits of the claim even though the issue is technically moot. *Socialist Workers Party v Secretary of State,* 412 Mich 571, 582, n 11; 317 NW2d 1 (1982).

In this case, the issue is whether the mayor can unilaterally impound an appropriation without seeking council approval to amend the budget. For the reasons articulated in the opinions of Justices WEAVER and CAVANAGH, I would find that the mayor cannot unilaterally impound an appropriation if to do so would frustrate the intent of the appropriation. Clearly, the mayor is not required to spend the entire amount appropriated if he can effect the purpose with less money. See opinion of CAVANAGH, J., *post* at 661. In this case, however, the mayor undoubtedly frustrated the intent to create an additional fire squad. His actions were

illegal under the charter and the basic principles set forth in *Detroit City Council v Mayor of Detroit,* 449 Mich 670; 537 NW2d 177 (1995), and *Detroit City Council v Stecher,* 430 Mich 74, 83; 421 NW2d 544 (1988).

IV

At issue in this case is whether plaintiff fire fighters have standing to assert violations of the budgetary provisions of the Detroit City Charter. Because plaintiffs are not the intended beneficiaries of the charter provisions, I would find that plaintiffs lack standing to sue.

With respect to the substantive issue, I would find the mayor's actions illegal because they frustrate the intent of the appropriation to create an additional fire squad. If the mayor desired to amend the budget, he was required to seek council approval consistent with the charter provisions. Accordingly, I would affirm the decision of the Court of Appeals on the issue of standing, but for different reasons, and would reverse the decision on the substantive issue.

BRICKLEY, C.J., concurred with RILEY, J.

CAVANAGH, J. (*dissenting in part and concurring in part*). I concur with Justice MALLETT with respect to the standing issue and agree that the plaintiffs do have standing. However, I disagree with him with respect to the impoundment of funds issue. Because this is an issue that may recur, I agree that we should address this issue. Therefore, I dissent on the standing issue. I concur with the lead opinion that the mayor's actions here violated the separation of powers doctrine. I write separately to offer a clarification of the boundaries of executive discretion.

I

In *House Speaker v Governor,* 443 Mich 560, 572; 506 NW2d 190 (1993), this Court restated the general rule of standing:

>    The concept of standing represents a party's interest in the outcome of litigation that ensures sincere and vigorous advocacy. However, a commitment to vigorous advocacy alone is not enough. Rather, "[s]tanding requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large." [Citation omitted.]

Additionally, the United States Supreme Court reviewed federal standing principles in *Lujan v Defenders of Wildlife,* 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992). The Court stated:

>    Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " . . . . Second, there must be a causal connection between the injury and the conduct complained of —the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [Citations omitted.]

Generally, an organization has standing if its "members themselves have a sufficient stake or have sufficiently adverse and real interests in the matter being litigated." *Trout Unlimited, Mus-*

*kegon-White River Chapter v City of White Cloud,*
195 Mich App 343, 348; 489 NW2d 188 (1992)
(citations omitted).

Here, the injury in fact of being burned in a fire
is concrete and imminent because fire fighters
respond to fires every day. The risk of this injury
would decrease by the addition of a specialized
squad because the fire fighters who respond to a
dangerous fire would have additional fire fighters
available more quickly. Therefore, causation has
been established. Additionally, a court's directive
to the mayor to spend the appropriated funds
would redress the persisting degree of risk of
harm. The degree of this risk is substantially
greater for fire fighters than it is for the general
public. Therefore, the plaintiffs have established
standing; as individual members of the association
they have met the threshold summarized in *Lujan.*

II

The substantive issue in this case involves the
effect of the separation of powers doctrine on the
implementation of a city's budget. A city receives
its self-governing authority through the home rule
cities act, MCL 117.1 *et seq.*; MSA 5.2071 *et seq.* In
this case, that authority is contained in the Detroit
City Charter. A city is also subject to the Uniform
Budgeting and Accounting Act (UBAA). MCL
141.421 *et seq.*; MSA 5.3228(21) *et seq.* We previ-
ously considered the interplay between the UBAA
and the Detroit City Charter in *Detroit City Coun-
cil v Stecher,* 430 Mich 74; 421 NW2d 544 (1988).[1]

---

[1] In *Stecher,* we concluded:

We hold that when, during a fiscal year, it becomes apparent
that the budget of the City of Detroit will not balance, *the
mayor has the responsibility and the power to make recommen-
dations to the city council* for appropriations transfers in order

There, we were concerned with the respective roles of the mayor and of the council in making amendments to a budget during a fiscal year. Here, we are concerned with the scope of the mayor's discretionary authority to implement or not to implement appropriations contained within an adopted budget.

The Detroit City Charter provides the initial budget adoption process[2] and also the procedure

to achieve a balanced budget to comply with the provisions of the UBAA. The city council may accept or reject recommendations submitted by the mayor to effect a balanced budget, but the council may not unilaterally amend the mayor's proposals. We further hold that the provisions of the Detroit Charter do not conflict with those of the Uniform Budgeting and Accounting Act. Therefore they may be read together to provide for an orderly process of budget amendment in the face of an impending budget deficit. Accordingly, the city council may not invoke the provisions of the UBAA to acquire authority prohibited to it by the Detroit Charter. [*Id.* at 90. Emphasis added.]

[2] The charter provides in part:

Sec. 8-203. Annual budget.

On or before April 1 each year, the mayor shall submit to the city council a proposed annual budget for the next fiscal year. Proposed capital appropriations shall be set forth in a separate section of the annual budget.

Sec. 8-204. The budget.

1. The budget shall constitute a complete financial plan for the city for the next fiscal year.

* * *

3. The total of proposed expenditures shall not exceed the total of estimated revenues.

Sec. 8-205. Form of appropriation.

All appropriations to each agency shall be made in lump sums to the agency's specific programs, services or activities or to additional classes as the mayor may recommend in the proposed budget, subject to amendment by deletion, addition or substitution by the city council.

Sec. 8-206. Public hearing.

A public hearing in the manner provided by law or ordinance shall be held on the proposed budget before adoption.

for making subsequent amendments to an adopted budget. During the initial adoption process, the mayor submits to the council a proposal for the next fiscal year's annual budget, which the council may accept either as is or with the council's own amendments. Detroit Charter, § 8-207. If the mayor disagrees with the council's amendments, the mayor is required to respond in writing to the council, explaining the reasons for disagreement. *Id.,* § 8-208.[3] Subsequently, if at least two-thirds of the council agree, the council can override the mayor's veto, and any amendment that is adopted pursuant to the override mechanism becomes part of the budget with "full force and effect." *Id.* Once adopted, "the budget shall constitute . . . [a]ppropriations of the amounts specified therein from the funds indicated . . . ." *Id.,* § 8-209. There are two sections that expressly provide for subsequent alterations to an adopted budget.[4]

Sec. 8-207. Amendment before adoption.

After the public hearing, the city council may adopt the budget with or without amendment.

[3]   Sec. 8-208. Budget adoption.

Consideration of the budget shall be completed by the city council not later than May 15. If the mayor disapproves amendments made by the city council, the mayor shall within 7 days, submit to the city council in writing the reasons for the disapproval.

The city council shall proceed to reconsider any budget item so disapproved. *If, after reconsideration a ⅔ majority of the city council members serving agree to sustain any of the city council's amendments to the budget, those amendments so sustained shall be of full force and effect.* The city council's reconsideration of the budget must be concluded within 3 business days after receipt of the mayor's disapproval. [Emphasis added.]

[4]   Sec. 8-210. Amendments after adoption.

1. If during the fiscal year the mayor advises the city council that there are available for appropriation revenues in excess of those estimated in the budget, the city council may make supplemental appropriations for the year up to the amount of the excess.

III

In this case, the council overrode Mayor Young's veto of a $750,000 appropriation to add a seventh fire squad to the city's fire department. Subsequently, Mayor Young refused to spend the appropriated funds. There is no express executive branch power to impound funds contained in either the Detroit City Charter or in the UBAA. Therefore, the issue is whether a mayor has the inherent discretion or authority not to implement an appropriation. The majority of the Court of Appeals held that a mayor does have such authority. It reasoned:

> An appropriation is not a mandate to spend. Under the UBAA, "appropriation" is defined as an *authorization,* not a requirement, to incur obligations and to expend public funds. MCL 141.422a(3); MSA 5.3228(22a)(3). Under both the UBAA and the city charter, the mayor has a duty to operate the city within a balanced budget, and must control spending so as to avoid a budget deficit. Were plaintiffs permitted to successfully challenge the mayor's discretionary decision to simply *not* spend, the mayor would be unable to prevent the deficit spending that is proscribed by law, a law that he is charged with upholding.
> We note specifically that the facts of this case

2. To meet a public emergency affecting life, health, property or the public peace, the city council may make emergency appropriations. To the extent that there are no available unappropriated revenues to meet those appropriations, the city council may authorize the issuance of emergency notes as provided by law, this charter or ordinance.

Sec. 8-211. Transfer of appropriations.
    At any time during the fiscal year upon written request by the mayor, the city council may, by resolution, transfer all or part of any unencumbered appropriation balance among the programs, services or activities within an agency or from one agency to another.

are distinguishable from those of *Stecher, supra,*
because the appropriation in question was neither
altered nor was it the subject of a transfer. There-
fore, the formal procedures set forth in the UBAA
and the city charter do not come into play.
*Stecher, supra,* p 77. [199 Mich App 129, 133-134;
501 NW2d 202 (1993).]

Before us now, the city again argues that an
appropriation is merely a fiscal planning device
that does not create any mandate; instead, it
merely designates the amount that a public official
*may* spend, not what it *must* spend.[5] The city adds

[5] The city also maintains that the charter calls for lump-sum
budgeting, Detroit Charter, § 8-205, and argues that this form of
appropriation was intended to give the executive branch maximum
control and responsibility for effective management. The plaintiffs
correctly counter that § 8-205 also allows for specifically earmarked
appropriations. The city further contends that the final appropriation
in the budget was not specifically earmarked for a seventh squad of
fire fighters. The city asserts that after the council's override, the
council reorganized the specific appropriations for the fire department
into lump-sum appropriations. However, it admits that the lump sums
allotted to separate fire funds increased by a total amount correspond-
ing to the override appropriation. Nevertheless, the city argues that
after this reorganization there was no earmarked portion for the new
fire squad. However, in a hearing for summary disposition before the
trial court, the city's attorney stated:

What happened here is an appropriation for a certain
amount was lumped into a particular cost center and I think
that's how they got the affidavit attached to the document . . . ,
which sets forth in specific fashion exactly what happened to
this money, how it first came into existence by Council action
and ultimately ended up in what's called the Red Book Budget
for 1989-90.

. . . What you've got is you've got a line item that was
created by City Council amendment of the Mayor's original
budget proposal. That line item indicated that a certain num-
ber of positions were to be added to the fire fighting division
operations for the addition of a squad.

Ultimately, as that item goes through the process it becomes
lumped into the total cost center which in this case ended up
being cost center 0718 or appropriation 718 for the cost center
of the fire fighting division operations, so it's lumped in there.
*It exists. It's in there. I don't think there's any doubt about
that.* [Emphasis added.]

that it is legally obligated to maintain a balanced budget.

In contrast, the plaintiffs rely on *Stecher* to argue that, even in the face of a budget deficit, the mayor has the responsibility to submit proposals to the council, and that it is the council, not the mayor, that has the ultimate authority for maintaining a balanced budget through amendments of the budget. The city admits that genuine amendments of the budget and transfers of funds between appropriations must be approved by the city council. It contends, however, that there was no such reappropriation or transfer of funds here. Instead, the city insists that Mayor Young, recognizing that revenues were going to fall short of prior predictions, simply chose not to spend the money. The city believes that this power not to spend is within the inherent executive power that is conferred on a mayor by the Detroit City Charter. It points to § 5-102, which provides:

> Except as otherwise provided by law or this Charter, executive and administrative authority for the implementation of programs, services and activities of city government is vested exclusively in the executive branch.

The city believes that the executive and administrative authority to implement the programs contained in the budget includes the authority not to implement those programs in order to control expenditures. Therefore, the city concludes that

Because counsel admitted that the specific appropriation still existed, even though "lumped" in with the general appropriation, the city's lump-sum characterization is inapposite because the council's stated purpose for the appropriation was clear. However, even lump-sum appropriations may place limitations on an executive branch's ability not to spend. *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America v Donovan,* 241 US App DC 122, 128; 746 F2d 855 (1984).

Mayor Young did not violate the separation of powers doctrine embodied in the UBAA and in the Detroit City Charter.

### IV

I do not believe that anyone can seriously dispute that an appropriation is not a mandate to the executive branch to spend the full appropriation. Additionally, the executive branch certainly has inherent discretion, if not a duty, to seek economic savings. However, this executive discretion may not extend so far as to usurp legislative authority. Adopting a budget is a legislative function. In contrast, proposing and implementing a budget are executive functions. Everyone here recognizes that the budget is no more than a financial plan, which may be adjusted throughout the fiscal year in order to adapt to changing financial conditions. However, I believe that the city's argument that what occurred here was merely a discretionary decision not to spend is too simplistic because the failure to implement the seventh fire squad, in effect, eliminated the appropriation entirely.

The question becomes, how do we strike a balance between the executive branch's discretionary power to operate within the financial plan and the legislative branch's intent and power to adopt the budget and to set fiscal policy.[6] The UBAA provides:

[6] The plaintiffs quote *Community Action Programs Executive Directors Ass'n of New Jersey v Ash,* 365 F Supp 1355, 1360-1361 (D NJ, 1973):

The Executive Branch has no authority, even for motives such as the control of inflation, to decide for itself whether to obey a law after the President has signed a bill into law, or after Congress has overridden a Presidential veto.

* * *

[O]nce Congress has appropriated funds for a specific pro-

"Appropriation" means an authorization granted by a legislative body to incur obligations and to expend public funds *for a stated purpose.* [MCL 141.422a(3); MSA 5.3228(22a)(3). Emphasis added.]

I think our solution lies with the "stated purpose" objective of an appropriation. If the executive branch has substantially accomplished the stated purpose, then it has legally operated within executive discretionary authority when it economically saved money by not spending the full amount. In other words, the mayor secured a "better deal," or the project did not cost as much as expected. However, if the effect of the "not spending" frustrated or thwarted the stated purpose, then the executive branch has not executed or implemented a legislative authorization. Instead, it has unilaterally adopted its own budget by deviating from, if not ignoring, the council's budget.[7]

---

gram, the Executive Branch has a duty to spend them. It has no authority under the Constitution to refuse to spend those funds, and performs only a ministerial function. [Citations omitted.]

[7] See *Rios v Symington,* 172 Ariz 3, 12; 833 P2d 20 (1992), which discussed general separation of powers principles. The court stated:

Thus, the Governor must manage the government in a fiscally responsible fashion and is not required, under all circumstances, to dispose of all appropriated money before the end of the fiscal year. *If the legislative purpose of the appropriation is carried out* and funds remain, the Governor may revert them. Budgets and appropriations bills are, in part, documents of estimation both on the income and expenditure side. Thus, some reversions are common and some are occasionally anticipated. However, we are of the view that our Constitution prohibits the Governor from substituting his judgment for that of the Legislature except through the use of the veto power. [Emphasis added.]

See also *West Virginia ex rel Steele v Kopp,* 172 W Va 329, 336-338; 305 SE2d 285 (1983) (a governor may not refuse to appropriate money that, in effect, eliminates a department that the legislature has expressly created).

This it cannot do.[8] As the court stated in *Oneida Co v Berle,* 49 NY2d 515, 524; 427 NYS2d 407; 404 NE2d 133 (1980):

> [T]he executive possesses no express or inherent power—based upon its view of sound fiscal policy—to impound funds which have been appropriated by the Legislature.

Instead, the mayor must comply with our decision in *Detroit City Council v Mayor of Detroit,* 449 Mich 670; 537 NW2d 177 (1995). A de facto deviation from the budget, which is, in effect, a postadoption amendment of the budget, requires joint action of the mayor and of the city council under UBAA, § 17,[9] and under Detroit Charter §§ 8-210, 8-211.

---

[8] The discretionary power of the executive cannot extend so far as to allow the executive to ignore the legislative branch's intent, otherwise there would remain no limitation on executive power. *Local 2677, American Federation of Government Employees v Phillips,* 358 F Supp 60, 77-78 (D DC, 1973).

"[W]hatever inherent authority to administer the executive budget may exist in the office of the chief executive, such authority may not normally be invoked to contradict major legislative budgeting determinations." *Colorado General Assembly v Lamm,* 700 P2d 508, 521 (Colo, 1985).

[9] Section 17 provides, in part:

Except as otherwise provided in section 19, *a deviation from the original general appropriations act shall not be made without amending the general appropriations act. The legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined. . . . If,* during a fiscal year, it appears to the chief administrative officer, . . . or to the legislative body that the actual and probable *revenues* from taxes and other sources in a fund *are less* than the estimated revenues, . . . *the chief administrative officer or fiscal officer shall present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year.* . . . The recommendations shall recognize the requirements of state law and the provisions of collective bargaining agreements. [MCL 141.437; MSA 5.3228(37). Emphasis added.]

V

In conclusion, I would hold that Mayor Young exceeded his executive discretionary power when he refused to spend any of the appropriated funds. He was not seeking a more economical means of adding a seventh fire squad, but rather, he was refusing to add the squad altogether. As such, he completely thwarted the stated purpose of the appropriation and violated the separation of powers doctrine.

The issue then turns to remedy. Here, the budget year has long since passed. Even assuming arguendo that we could make such an order, from a purely practical viewpoint, we would be unable to order the defendants to spend the appropriated funds so many years after the fiscal year in which this dispute arose. However, in future cases, a trial court, faced with this issue during the fiscal year, should have the authority to issue a writ of mandamus to the mayor to do one of two things: implement the program or seek a formal amendment of the budget through joint action with the council. If the council believes that continued implementation of the program would be unwise, it, along with the mayor, can freely amend the appropriation. If, on the other hand, the council continues to support the appropriated program, the mayor has no authority to thwart the council's stated purpose of the appropriation.

For the reasons stated above, I would reverse the decision of the Court of Appeals with respect to both issues.

BOYLE, J., concurred with CAVANAGH, J.

MALLETT, J. (*concurring in the result only*). Al-

though we agree with the result that the lead opinion reached, we disagree on the issue of standing. We believe that the plaintiffs have an interest in the expenditure of appropriated funds sufficiently different than the general public that would confer standing on them. However, we do not believe that the mayor can be compelled by statute or by city charter to expend the appropriated funds. Thus, plaintiffs are not entitled to relief.

I

The lead opinion would hold that the plaintiffs' membership in the association does not set them aside or make their interest in this suit any different from that of the general public or any other city employee. *Ante* at 634 and 637-638. We believe that it does and would hold that plaintiffs' membership in the association and the nature of the association members' occupations makes their interest sufficiently different than that of the general public.

"The concept of standing represents a party's interest in the outcome of litigation that ensures sincere and vigorous advocacy." *House Speaker v Governor,* 443 Mich 560, 572; 506 NW2d 190 (1993). However, evidence that a party will engage in full and vigorous advocacy alone is insufficient. *House Speaker v State Administrative Bd,* 441 Mich 547, 554; 495 NW2d 539 (1993). Standing requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large. *Id.* at 554. It is necessary and appropriate to examine the substantive issue and determine whether there is a logical nexus between the plaintiffs' status and the substantive claim. *Flast v Cohen,* 392 US 83;

88 S Ct 1942; 20 L Ed 2d 947 (1968). The question in the present case is whether the plaintiff can demonstrate any special right, injury, or zone of interest that deserves the protections of the law. None of these inquiries are answered by the resolution of the case on the merits.[1]

The position of the lead opinion also would conflict with earlier decisions regarding standing generally and, more specifically, regarding the standing of labor organizations. These plaintiffs have a sufficient interest in the outcome of litigation and indeed will be detrimentally affected in a manner different from the citizenry at large.

The lead opinion relies heavily on *Saginaw Fire Fighters Ass'n Local No 422 v Police & Fire Dep't Civil Service Comm,* 71 Mich App 240; 247 NW2d 365 (1976).[2] In that case, the trial court granted the fire fighters association summary disposition and granted an injunction against the defendant to refrain from testing or recruiting nonresident applicants for positions within the fire department. The relevant statute[3] required that the commission hire on the basis of several factors including one-year residency. The residency requirement could be waived if there were not enough qualified residents to meet the open positions.

---

[1] See *Northeastern Florida Contractors v Jacksonville,* 508 US 656, —; 113 S Ct 2297, 2303; 124 L Ed 2d 586 (1993).

When the government.erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. [Emphasis added.]

[2] The lead opinion also frequently cites *Kaminskas v Detroit,* 68 Mich App 499; 243 NW2d 25 (1976). However, *Kaminskas* is a taxpayer standing case and therefore is not relevant to whether the association possesses standing in the present case.

[3] MCL 38.501 *et seq.*; MSA 5.3351 *et seq.*

The Court of Appeals held that none of the current union members had been injured by the requirements of the residency regulation. Instead, the plaintiffs were asserting the rights of future applicants who may be denied membership because of the waiver. *Id.* at 244. In the present case, the plaintiffs are not asserting the rights of future members. Rather, by seeking the additional manpower, plaintiffs are asserting their own right to a safer work environment. Moreover, the United States Supreme Court has recently held that an association of contractors is not required to show that one of its members would have prevailed in the substantive portion of its claim in order to have standing. See *Northeastern Florida Contractors v Jacksonville,* 508 US 656, —; 113 S Ct 2297, 2302-2303; 124 L Ed 2d 586 (1993).

We also find that *Rayford v Detroit,* 132 Mich App 248; 347 NW2d 210 (1984), is not determinative of the standing issue in the present case. (See opinion of RILEY, J., concurring in part and dissenting in part.) In *Rayford,* the plaintiffs brought suit pursuant to the UBAA, in an attempt to require the city to reinstate laid-off police officers. The Court of Appeals determined that a necessary inquiry in standing cases is whether the plaintiffs are "within the class of persons intended to be benefitted by the legislation." *Id.* at 256. The Court went on to hold that because the UBAA's purpose is to promote uniform budgets and avoid deficit spending, "[a]ny action under [the] statute must be initiated by the Attorney General . . . ." *Id.* at 257. However, we find that such a test does not make sense in this case. First, it appears that courts considering the standing issue take one of two paths on an ad hoc basis, that is, whether the plaintiffs are affected differently than the general public or whether the plaintiffs are within the

class of persons intended to be benefited by the legislation. While it may be appropriate to use the latter test when suit is brought under the UBAA, it is inappropriate when suit is brought under the city charter because that document does not provide for enforcement by a public law enforcement officer. Therefore, we find *Rayford* to be inapplicable to the circumstances presented here.

This Court denied leave to appeal in *Muskegon Bldg & Construction Trades v Muskegon Area Intermediate School Dist,* 130 Mich App 420; 343 NW2d 579 (1983), a case that is more analogous to the present case than is *Saginaw Fire Fighters* or *Rayford.* In *Muskegon Trades,* the Court of Appeals conferred standing on a labor organization that was seeking an injunction to enjoin the defendant school district from seeking bids that did not provide the prevailing wage and fringe benefits. Furthermore, in *Northeastern Florida Contractors, supra,* the United States Supreme Court held that an association of general contractors had standing to challenge the constitutionality of a city ordinance under the Equal Protection Clause.

In the instant case, plaintiff association presented evidence that its members were exposed to a significantly increased risk of injury without the increased manpower and additional squad company. Plaintiffs' expert testified at the arbitration hearings that the number of battalions and squad companies represented the manpower the city is able to provide. In previous years there were eleven battalions and eleven squad companies. The idea was to provide a support squad for each battalion. At the time of the hearing, there were nine battalions and six squad companies. This represents a decrease in manpower of thirty-two percent.

Plaintiffs alleged that this appropriation was

intended to finance plans to bring the number of
squads up to the level of battalions. The expert
testified that the overall drop in manpower cou-
pled with the unequal distribution of squad sup-
port resulted in a substantial safety threat to the
fire fighters. Inadequate staffing levels, large cover-
age areas, and inadequate squad support likely
result in an increase in the time and scope of the
fire fighters' assignments. Additionally, they con-
front the dangers of fires on a daily or at least
weekly basis. Therefore, plaintiffs have shown that
its members are especially adversely affected by
the mayor's decision not to spend the budget ap-
propriation at issue.[4] The general public is af-
fected, but that group is considerably larger than
the fire fighters and therefore the fire fighters are
at a proportionately higher degree of risk. The fire
fighters' claim affects the safety and well-being of
each fire fighter to a sufficiently greater degree
than that of the general public and therefore, the
fire fighters should be conveyed standing.[5]

II

Because we find that the plaintiffs should be
conferred standing, we find it necessary to address
the substantive issue raised by the plaintiffs, that
is, whether the executive branch of the City of

---

[4] We agree with the dissenting judge:

   The increased risk of injury to fire fighters is different in
   degree and in kind from that of the general public. A fire
   fighter is much more likely to sustain injury due to the insuffi-
   ciency of fire fighters than is a member of the general public.
   The more fires one encounters, the greater the likelihood of
   injury. [199 Mich App 129, 135; 501 NW2d 202 (1993).]

[5] The individual plaintiffs also claim that standing should be con-
ferred because of their status either as city employees or as taxpay-
ers. Because we would hold that plaintiff association has standing, we
need not reach this issue.

Detroit may ignore a veto override by the city council and not expend previously appropriated funds? We would hold that because the mayor is responsible for controlling deficit spending and balancing the budget, he is not required to expend appropriated funds.

The decision of the Court of Appeals that found that the actions of the defendant were not prohibited by the Detroit City Charter or state law is consistent with this Court's rulings in *Detroit City Council v Stecher,* 430 Mich 74; 421 NW2d 544 (1988), and *Detroit City Council v Mayor of Detroit,* 449 Mich 670; 537 NW2d 177 (1995) (LEVIN, J.). In *Stecher,* this Court concluded that the Detroit City Council did not have the power to unilaterally divert or transfer appropriations. *Id.* at 77. Applying this broad principle, we must determine whether, in the instant case, city council approval is required before the mayor chooses not to spend appropriated funds.

In *Detroit City Council v Mayor,* we held that § 17 of the Uniform Budgeting & Accounting Act requires council approval only when it involves the "reallocation or diversion of previously budgeted funds from one use to another . . . ." 449 Mich 678-679 (opinion of LEVIN, J.). Because "an appropriation is not a mandate to spend,"[6] we held that the "mayor is under no obligation under § 17 to continue to spend money in a manner that may ultimately be dangerous to the city's financial health . . . ." *Id.* at 681. Therefore, in the present case, the act of not spending previously appropriated funds is within the mayor's discretionary executive powers.

In *Lincoln v Vigil,* 508 US 182; 113 S Ct 2024;

---

[6] *Detroit City Council v Mayor,* 449 Mich 680 (LEVIN, J.) (citing 64 CJS, Municipal Corporations, § 1888, p 454). See also Const 1963, art 5, § 20. "No appropriation shall be a mandate to spend."

124 L Ed 2d 101 (1993), the Supreme Court explained that the purpose of a lump-sum appropriation is to provide the capacity to adapt to changing circumstances and meet responsibilities in a manner that would be the most effective and desirable. *Id.* at 113 S Ct 2031, citing *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America v Donovan,* 241 US App DC 122, 128; 746 F2d 855 (1984). Similarly, the importance of this flexibility is demonstrated by an analysis of the purpose behind the city budget. The city budget is a planning document consisting of proposed expenditures and estimated revenues. The Uniform Budgeting & Accounting Act[7] defines an appropriation as an "authorization granted by a legislative body to incur obligations and to expend public funds for a stated purpose." MCL 141.422a(3); MSA 5.3228(22a)(3). Neither the act nor the city charter define or address an appropriation as a mandate to spend.

Section 8-204 of the city charter charges the mayor with the duty to operate the city within a balanced budget, and the mayor must control spending in order to avoid a budget deficit. Once an appropriation has been made, it may only be spent for other purposes and only by a formal transfer instituted by the mayor and approved by the city council. This is a common government restriction. See 3 McQuillin, Municipal Corporations (3d ed rev), § 12.43, p 249.

The charter provides that the city has comprehensive home rule power and that those powers should be liberally construed. Detroit City Charter, art 1, §§ 1-102 and 1-103. To that end, it delegates a great deal of responsibility to the mayor as chief executive and administrative officer. The mayor

---

[7] MCL 141.421 *et seq.*; MSA 5.3228(21) *et seq.*

must have the requisite authority and flexibility to perform his charter-mandated duties.[8]

Under well-established law, the decision of the executive not to spend the entire amount of a lump-sum appropriation when confronting a budget deficit does not constitute an improper change of an adopted budget or an improper encroachment on the legislative authority to approve and amend the budget. Therefore, we would find that the plaintiffs are unable to compel the defendants to spend the appropriated funds in the instant case.

### III

We would grant the plaintiffs standing because they are clearly affected in a different manner and degree than the general public by the subject matter of the substantive claim. However, because an appropriation is not a mandate to spend, the mayor is not required to spend appropriated funds when he is exercising his executive authority to operate within the budget. Thus, we would resolve this case in favor of the defendants.

LEVIN, J., concurred with MALLETT, J.

---

[8] Moreover, this concept does not conflict with the separation of powers principles. It is the executive that has the reserved right to withhold appropriated money. There is not a usurpation of the executive powers if the mayor chooses not to spend. The mayor's discretionary decision is totally within the sphere of powers given to the executive branch of the government. The broad grant of authority given the City of Detroit under the Michigan Constitution, the home rules city act, MCL 117.1 *et seq.*; MSA 5.2071 *et seq.*, and the 1974 Detroit City Charter, was recently discussed by this Court in *Detroit v Walker*, 445 Mich 682; 520 NW2d 135 (1994).