*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHARLES W. FERREL,

Plaintiff-Appellant,

v

ISRAELITE HOUSE OF DAVID, IHOD I, LLC,
IHOD II, LLC, IHOD III, LLC, IHOD IV, LLC,
IHOD V, LLC, IHOD VI, LLC, IHOD VII, LLC,
IHOD VIII, LLC, IHOD IX, LLC, IHOD X, LLC,
GREGORY EVERSOLE, and BRIAN ZIEBART,

Defendants-Appellees.

UNPUBLISHED
April 2, 2020

No. 345737
Oakland Circuit Court
LC No. 2018-163929-CZ

Before: BECKERING, P.J., and SAWYER and GADOLA, JJ.

PER CURIAM.

Plaintiff, Charles W. Ferrel, appeals as of right the trial court's order granting summary disposition to defendants under the ecclesiastical abstention doctrine and plaintiff's lack of standing to bring his claims. We affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

### A. BACKGROUND

Defendant Israelite House of David ("IHOD") is a voluntary religious association, which was formed in 1903 in Benton Harbor, Michigan, by Benjamin Purnell and his wife, Mary Purnell. Benjamin believed that he was the seventh and final messenger prophesied in the biblical Book of Revelation who would lead the faithful to the "ingathering" of Israel. IHOD was originally organized as a religious corporation to acquire and hold title to community property. After the Michigan Attorney General determined in 1907 that IHOD's real-estate holdings violated its charter because its holdings exceeded the organization's requirement for religious purposes, IHOD reorganized in 1908 as a voluntary religious association. In 1922, Benjamin filed "Articles of Faith and By-laws of the Israelite House of David" with the Berrien County Register of Deeds and the Michigan Secretary of State. The Articles of Faith provided for officers called "Pillars" and an advisory board of trustees. The Pillars had "full and complete power to manage, control, and

-1-

act in all spiritual and temporal affairs of the association as they deem best" for IHOD and its members. They had the authority to acquire real and personal property and were charged with applying the property or proceeds to the purposes of the organization, particularly for preparing for the ingathering of Israel. The Pillars also had the authority to admit and expel members. Members were expected to give all their possessions to IHOD for the association's use when they were admitted. Defendants maintain that the Articles of Faith and By-Laws continue to govern IHOD.

Benjamin Purnell also traveled to Australia and established an IHOD colony there in 1904. He acquired a significant amount of land in Australia to accommodate IHOD disciples for the ingathering. Over the years, the membership in the Australian colony dwindled, and by the early 2000s there was only one remaining Australian member, a trustee named Joyce Jones, who died in 2010. However, the Australian assets, managed by lawyers and accountants there, had allegedly greatly appreciated in value. Plaintiff alleges that the Australian property is valued at more than $50 million.

Benjamin Purnell died in December 1927. In 1930, IHOD split into two factions, with Mary Purnell and 215 followers leaving the group and H. T. Dewhirst leading the remaining IHOD members. Pursuant to an agreement between the two factions, the circuit court entered a decree that partitioned IHOD's property, conveying one portion to Mary Purnell as trustee and the other portion to IHOD and its remaining members. IHOD membership also declined in the United States. By the 2000s, the leader in Benton Harbor was Wilma Estes, who recruited plaintiff Charles Ferrel and his mother Betty Ferrel. The Ferrels, along with plaintiff's partner, Gregory Furstenwerth, became members of IHOD in January 2010. Plaintiff was made a trustee in March 2010, and a Pillar in December 2012. Furstenwerth became a trustee in April 2013. Estes gave plaintiff the task of re-establishing operations in Australia to further the religious purpose for which the Australian land had been acquired. Plaintiff and Furstenwerth traveled many times to Australia.

Plaintiff, his mother, and Furstenwerth (collectively "the departing members") later moved to Hawaii. According to plaintiff, the departing members lived in Hawaii with the full approval of Estes to establish a "way station," a "resting place between Australia, where the faithful would stay, and Benton Harbor, where the faithful would return from Australia via Hawaii and repopulate the earth." According to defendants, the departing members "resided at a home purchased with IHOD's funds," for which "IHOD paid all of the expenses," "including taxes, insurance, utilities and upkeep and also paid all of the Ferrels' and Furstenwerth's living expenses." Defendants allege that "Ferrel and Furstenwerth lived a lavish lifestyle and expended large sums of IHOD's money on property and vehicles" while living in Hawaii.

According to plaintiff, the Mary Purnell faction of the former IHOD evolved into various groups throughout the years. By the early 2000s, one offshoot was a corporation named House of David Historeum and Preservation Society, which was located in Benton Harbor. Its then president was Christopher Siriano, who was an acquaintance of defendant Gregory Eversole. Both men, according to plaintiff, were curious about IHOD and came up with a plan whereby Eversole would "infiltrate" IHOD by "ingratiating himself" to Estes. Eversole used his knowledge of accounting to suggest to Estes that he could help IHOD. Plaintiff alleges that Eversole eventually acknowledged to Estes that infiltration had been his original intent, but then claimed that he had

"seen the light" and was now "a true believer in IHOD doctrine." Eversole was admitted to IHOD membership in or around 2010. Plaintiff asserts that before Eversole became a member, he transferred his own property and business to his family to keep it from IHOD, contrary to IHOD's tenets.

Plaintiff alleged that Eversole took advantage of the fact that the departing members were in Hawaii and IHOD was paying their expenses to "drive a wedge between them and Ms. Estes so as to prevent [them] from interfering with Mr. Eversole's plans to use the assets of IHOD for non-religious purposes and to enrich himself at the cost of the religion." According to plaintiff, he and Furstenwerth became increasingly concerned about IHOD's potential tax problems, but Eversole dismissed their concerns. Plaintiff eventually convinced Estes to seek outside tax and legal advice, and it was discovered that IHOD had "significant tax problems." Plaintiff alleges that Eversole abused Estes's trust, bullied her, threatened her physically, and convinced her that plaintiff and Furstenwerth should be relieved of their duties. IHOD excommunicated plaintiff and Furstenwerth in July 2013. IHOD then sued to evict the departing members from the property in Hawaii.

Defendants maintain that the "lavish lifestyle" plaintiff and Furstenwerth shared in Hawaii and their refusal to transfer title to the Hawaii property to IHOD contributed to problems that IHOD was having with the Internal Revenue Service (IRS). IHOD hired an attorney, Eric Nemeth, to address the tax issues. According to defendants, because of the actions of plaintiff and Furstenwerth, the IHOD Pillars and advisory board voted to excommunicate both men and remove them from their leadership positions.

When the departing members did not vacate the Hawaii property, IHOD filed a lawsuit against them in Hawaii in August 2013 to recover the property. Plaintiff, his mother (who had not been excommunicated), and Furstenwerth alleged claims of "unlawful termination/expulsion" and "cessation of all support" as well as IHOD's "lack of compliance with federal and state tax laws." Following negotiations, the departing members entered into a Confidential Settlement Agreement and Mutual Release with IHOD, effective September 30, 2013.

The Settlement Agreement provided for the transfer of the Hawaii real estate to IHOD, the transfer of title to certain vehicles and a dive-boat assembly to IHOD, and required the departing members to vacate the Hawaii property. The Settlement Agreement further provided, in pertinent part:

> IHOD and the Departing Members are now desirous of settling and resolving their disputes in a confidential manner with neither side admitting fault or liability.
>
> Therefore, the undersigned parties agree as follows:
>
> 1. Membership. As of the Effective Date, the Departing Members each hereby irrevocably relinquish their respective IHOD membership and all rights attendant thereto.
>
> 2. Resignation of Official Capacities. As of the Effective Date, the Departing Members resign any and all offices and positions they may hold in IHOD as Trustee, Pillar, or otherwise.

-3-

* * *

6. <u>Settlement Amount and Initial Payment to Departing Members</u>. In consideration for entering into this Agreement, the transfer of their IHOD membership interests, and to resolve all outstanding disputes as between the parties, IHOD agrees to pay to the Departing Members the gross sum of $[****].

* * *

8. <u>Waiver and Release by Departing Members</u>. In consideration of the benefits conferred by this Agreement, the Departing Members hereby unconditionally waive, release, discharge, and covenant not to sue with respect to, all claims, actions, debts, liabilities, rights, and/or demands of any kind, known or unknown, fixed or contingence [sic], that they have or may ever claim to have based on facts existing at the time of this Agreement ("Departing Member Claims") against all of the following: IHOD; all current and former members, trustees and Pillars of IHOD; all current and former employees of IHOD; all current and former agents of IHOD; IHOD's insurers; and IHOD's attorney and other professionals.

This release and waiver includes, without limitation, the Hawaii Realty, the Audi Q7, the Major Appliances and Lawn Equipment, and the Dive Boat Assembly.

This release and waiver does <u>not</u> include IHOD's continuing obligations under this Agreement.

* * *

14. <u>Confidentiality</u>. The Departing Members and IHOD promise and agree that they shall not disclose to anyone at any time the terms of this Agreement other than that their disputes have been settled. However, the parties may make statements and/or disclosures otherwise prohibited under this paragraph if compelled to do so by court order or valid subpoena or to the extent necessary to enforce this Agreement, and they make may [sic] such statements and disclosures to their attorneys and accountants. . . .

15. <u>Noncontact</u>. The Departing Members agree that for their natural lives to [sic] not intentionally contact the IHOD or any members except through their respective representatives. This includes in particular entrance or attempted entrance onto IHOD property. For their part, the IHOD agrees to a reciprocal noncontact provision. . . .

In addition, IHOD and the departing members dismissed the Hawaii lawsuit with prejudice, IHOD undertook responsibility for the preparation of personal tax returns for the departing members for the tax years 2010, 2011, and 2012, and IHOD agreed to indemnify the departing members for any tax liabilities they incurred from January 1, 2004, to the dates of their individual IHOD terminations.

After the Settlement Agreement was executed, IHOD worked with attorney Eric Nemeth to resolve its tax and property issues and obtained a favorable resolution of its issues with the IRS. Nemeth recommended that IHOD form 10 wholly-owned limited liability companies to protect its assets and maintain confidentiality. The IRS accepted the necessary tax documents concerning the LLCs. IHOD asserts that the formation of the LLCs was done in accordance with its Articles of Faith.

## B. PRESENT CASE

In February 2018, plaintiff filed the instant action against IHOD, its various LLC entities, Eversole, and Brian Ziebart, a member and trustee of IHOD. However, plaintiff did not immediately serve the complaint on defendants. Instead, he sent a copy of the complaint to the Michigan Attorney General with a request that the Attorney General's office join the case pursuant to its quo warranto powers under MCR 3.306. The Attorney General declined to become involved. Plaintiff then filed a motion in circuit court for leave to bring a quo warranto claim and file an amended complaint. In May 2018, the circuit court granted plaintiff's motion for leave to file an amended complaint.

Plaintiff filed his amended complaint on May 16, 2018. The complaint alleged that the departing members believed that IHOD would continue to operate as a religion when they entered into the Settlement Agreement, even though at the time there were only three members left—Estes, defendant Eversole, and William Robertson, who was "quite elderly." Estes died on May 31, 2016. Eversole made defendant Ziebart a trustee and later a member. Plaintiff alleged that neither Eversole nor Ziebart donated their assets to IHOD, and accordingly, there were now "no proper members of IHOD." Plaintiff also alleged that defendant Eversole so changed IHOD that the organization that entered into the Settlement Agreement with the departing members no longer existed. Plaintiff alleged that he should be "allowed to reestablish his membership as the only person committed to maintain[ing] the faith." Plaintiff also alleged that he had suffered individual damages as a "direct and proximate result of [d]efendants' wrongful conduct in diverting IHOD from its stated mission, making the teachings inaccessible, and essentially destroying the religious nature of the organization" Plaintiff's alleged damages consisted of the following:

> a. Plaintiff has been deprived of the means and mechanisms necessary for the free exercise of his chosen religion;
>
> b. Plaintiff has been prevented from participating in the central tenet and goal of the religion—the "ingathering of the flock of God." A primary goal of the organization was to provide a place for that ingathering and a means for the faithful adherents to access that location which Defendants have now made impossible;
>
> c. Plaintiff has been denied access to the printed materials containing the prophecies and teachings of Brother Benjamin;
>
> d. Plaintiff has been deprived of the means to spread the gospel to others;
>
> e. Plaintiff has been shut out of access to "Shiloh" the central place of worship in Benton Harbor, Michigan at which the tomb of Brother Benjamin is located;

f.  Plaintiff is cut off from the means of communication with other believers;

g.  Plaintiff has been exposed to potential tax liabilities if IHOD loses its favored 501(d) tax status; and

h.  Plaintiff has suffered extreme emotional distress from the loss of the means to practice his religion and the specter of being deprived of salvation.

Plaintiff further alleged that, when entering the Settlement Agreement, he "reasonably anticipated that IHOD would continue to be conducted as the religion that gave spiritual comfort to Plaintiff and the means through which to ascend into heaven upon his death." Plaintiff maintained that his injuries are "an invasion of a legally protected interest—the right to free exercise of Plaintiff's chosen religion." He asserted that the injuries are particularized as to him and would be redressed by a favorable decision from the court. He contended that he had standing to bring the claims and they were not waived or barred by the release in the Settlement Agreement because the agreement did not apply to events that occurred after its effective date.

In Count I, plaintiff sought a declaratory judgment that IHOD's property was held in trust for the ingathering of Israel and that defendants were diverting the assets from their intended purpose in violation of IHOD bylaws, the trust, and a judicial decree governing the use of the assets. Plaintiff maintained that, as perhaps the only true believer and adherent to the tenets of IHOD, he was uniquely qualified to manage the assets of IHOD and advance its religious purposes. Therefore, he requested a declaratory judgment that defendants had improperly diverted IHOD from its stated mission and that plaintiff was qualified to have possession and control of IHOD's assets, or alternatively that the Attorney General, acting through plaintiff, request dissolution of IHOD and escheat of its assets to the state.

In Count II, plaintiff sought injunctive relief to enjoin defendants "from furthering their plan to divert IHOD's assets to purposes of their own foreign to IHOD's mission and historical activities." In Count III, Conversion from the Church, plaintiff maintained that the individual defendants and the IHOD LLCs willfully converted IHOD's property and funds "by diverting them to purposes beyond IHOD's charter and bylaws and in violation of the trust and judicial decree specifying the proper use of such assets." Plaintiff alleged that defendants were liable for treble damages pursuant to MCL 600.2919. In Count IV, Breach of Fiduciary Duty, plaintiff asserted that, as trustees, defendants Eversole and Ziebart owed a strict fiduciary duty to IHOD, which they violated by "causing and permitting IHOD to operate beyond, and in excess of, and in violation of, its charters, bylaws, and express trust provisions." In Count V, plaintiff asserted that he was entitled to an accounting from Eversole, Ziebart, and possibly others, "for all funds and property which may have been diverted by them from IHOD's legitimate purposes."

Defendants did not answer the complaint but moved for summary disposition under MCR 2.116(C)(4), (C)(5), (C)(7), (C)(8), and (C)(10). Defendants argued that plaintiff's claims were barred by the Settlement Agreement's waiver and release and should be dismissed under MCR 2.116(C)(7). Defendants also argued that they were entitled to summary disposition under MCR 2.116(C)(5) because plaintiff lacked standing to bring his claims, given that he was excommunicated from IHOD in July 2013, and that in the Settlement Agreement plaintiff voluntarily relinquished his IHOD membership and all rights attendant thereto, and also agreed to

never contact IHOD or enter its property. Further, because he was no longer a member of IHOD, defendants did not owe him a fiduciary duty and he was not entitled to an accounting from them. Finally, defendants maintained that they were entitled to summary disposition under MCR 2.116(C)(4), (C)(8), and (C)(10) because the ecclesiastical abstention doctrine barred plaintiff's claims, and the court had no subject-matter jurisdiction to decide these matters.

The trial court disagreed with defendants that the ecclesiastical abstention doctrine divested it of subject-matter jurisdiction to consider plaintiff's claims, but concluded that the doctrine supported dismissal, and further concluded that plaintiff lacked standing to bring his claims under MCR 2.116(C)(5). The court also found that the facts did not support plaintiff's quo warranto claim. The trial court stated:

> Nevertheless, I find that this matter ultimately in the vast majority of the plaintiff's complaint involves a religious dispute. Because there are religious questions at issue to determine the proper handling of defendant's assets, I find that the Ecclesiastical Abstention Doctrine does apply, and the Court is declining to resolve those religious disputes.
>
> To the extent that there might be a portion of plaintiff's complaint that involves strictly a property dispute, . . . I do find that the plaintiff does not have standing to pursue those claims . . . . [Plaintiff] irrevocably . . . relinquished his respective IHOD membership and all rights attended [sic] thereto, and when he executed that Settlement Agreement, he agreed not to have any contact with IHOD or its members for the rest of his life.
>
> So, therefore, whatever they're doing in terms of moving assets, I find that he does not have standing. And to the extent that somehow the moving of the asset pre—assets prevent him from practicing his religious belief, that, again, would fall under the Ecclesiastical Abstention Doctrine, and—and the Court declines to resolve those issues. I—under the facts that are presented to the Court right now, I find that there are no facts to support a quo warranto claim under the court rules, and I would dismiss that as well.

This appeal followed.

## II. ECCLESIASTICAL ABSTENTION DOCTRINE

Plaintiff argues that the trial court erred by holding that his claims were barred by the ecclesiastical abstention doctrine. We disagree.

This Court reviews de novo a trial court's decision to grant or deny a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Although defendants argued that the ecclesiastical abstention doctrine deprived the trial court of subject-matter jurisdiction to consider plaintiff's claims, thereby entitling them to summary disposition under MCR 2.116(C)(4), the trial court disagreed that it lacked jurisdiction to consider the claims. Defendants further argued that the ecclesiastical abstention doctrine supported summary disposition under MCR 2.116(C)(8) and (10). A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. *Maiden*, 461 Mich at 119. "Only the pleadings may be considered

where the motion for summary disposition is based on subrule (C)(8)." Conversely, a motion for summary disposition pursuant to MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). This Court reviews a "motion brought under MCR 2.116(C)(10) by considering the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008). Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *Id.* Because the parties each submitted documentary evidence and the trial court appears to have considered evidence beyond the pleadings in deciding the applicability of the ecclesiastical abstention doctrine, review is appropriate under MCR 2.116(C)(10). Questions of law are reviewed de novo. *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 333; 901 NW2d 566 (2017).

The ecclesiastical abstention doctrine "arises from the Religion Clauses of the First Amendment of the United States Constitution." *Id.* at 337. These clauses provide, in part, that "Congress shall make no laws respecting an establishment of religion, or prohibiting the free exercise thereof." US Const, Am I. The religion clauses of the First Amendment apply to the states through the Fourteenth Amendment. *Winkler*, 500 Mich at 337 n 4. It is well-settled law in Michigan that the courts are "severely circumscribed by the First and Fourteenth Amendments to the United States Constitution and art 1, § 4 of the Michigan Constitution of 1963 in resolution of disputes between a church and its members." *Pilgrim's Rest Baptist Church v Pearson*, 310 Mich App 318, 323; 872 NW2d 16 (2015), overruled in part in *Winkler*, 500 Mich at 337-340. Our Supreme Court has stated that application of the doctrine in Michigan

> reflects [the] Court's longstanding recognition that it would be "inconsistent with complete and untrammeled religious liberty" for civil courts to "enter into a consideration of church doctrine or church discipline," to "inquire into the regularity of the proceedings of church tribunals having cognizance of such matters," or "to determine whether a resolution was passed in accordance with the canon law of the church, except insofar as it may be necessary to do so, in determining whether or not it was the church that acted therein." [*Winkler*, 500 Mich at 337-338, quoting *Van Vliet v Vander Naald*, 290 Mich 365, 370-371; 287 NW 564 (1939).]

Under the ecclesiastical abstention doctrine, a civil court "may not substitute its opinion in lieu of that of the authorized tribunals of the church in ecclesiastical matters." *First Protestant Reformed Church v DeWolf*, 344 Mich 624, 631; 75 NW2d 19 (1956). The ecclesiastical abstention doctrine "thus operates to ensure that, in adjudicating a particular case, a civil court does not infringe the religious freedoms and protections guaranteed under the First Amendment." *Winkler*, 500 Mich at 338. Prior decisions of this Court and the Michigan Supreme Court had held that application of the doctrine deprived civil courts of subject-matter jurisdiction over a particular case. See, e.g., *Pilgrim's Rest Baptist Church*, 310 Mich App at 323; *Dlaikan v Roodbeen*, 206 Mich App 591; 522 NW2d 719 (1994), overruled in *Winkler,* 500 Mich at 330. However, the Supreme Court recently overruled those decisions in *Winkler*, 500 Mich at 340-341, and held that applying the term "subject-matter jurisdiction" to application of the ecclesiastical abstention doctrine was inaccurate, and the doctrine "does not . . purport to deprive civil courts of the right . . . to exercise judicial power over any given class of case." The court explained:

What matters instead is whether the actual adjudication of a particular legal claim would require the resolution of ecclesiastical questions; if so, the court must abstain from resolving those questions itself, defer to the religious entity's resolution of such questions, and adjudicate the claim accordingly. The doctrine, in short, requires a case-specific inquiry that informs how a court must adjudicate certain claims within its subject matter jurisdiction; it does not determine whether the court has such jurisdiction in the first place. [*Id.*]

In *Jones v Wolf*, 443 US 595; 99 S Ct 3020; 61 L Ed 2d 775 (1979), a case involving a property dispute between two separating factions of a Georgia congregation, the Georgia Supreme Court adopted what has become known as the "neutral principles of law" method. The court "examined the deeds to the properties, the state statutes dealing with implied trusts . . . and the Book of the Church" before awarding the property on the basis of legal title. *Id.* at 597, 600. The United States Supreme Court noted that application of the "neutral principles of law" approach, at least in the state of Georgia,

> requires a civil court to examine certain religious documents . . . . In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts . . . If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. [*Id.* at 604.]

In the present case, the trial court correctly recognized that it did have subject-matter jurisdiction over plaintiff's claims. However, the court also determined that plaintiff's complaint involved a religious dispute, and there were religious questions that needed to be answered to determine the proper handling of IHOD's assets. Because the court determined that plaintiff's claims were largely, if not entirely, barred by the doctrine of ecclesiastical abstention, the court declined to resolve the religious dispute and granted defendants' motion for summary disposition.

The trial court did not err by ruling that resolution of plaintiff's claims would require a decision on matters of church doctrine and polity. Plaintiff argues that his complaint did not seek resolution of any religious issues but concerned a dispute about real estate. This statement is belied by an examination of plaintiff's amended complaint. In his complaint, plaintiff alleged that defendants Eversole and Ziebart were not proper members of IHOD because they did not donate their assets to IHOD, as required by the Articles of Faith, and did not ascribe to the tenets of IHOD. He referred to them as "opportunists" who "have zero faith in the religion and no intent to further IHOD's purposes in accordance with the message of Benjamin." Plaintiff maintained that, with the exception of William Robertson, who was elderly and may have suffered from dementia, "there are no proper members of IHOD." Plaintiff further alleged that, unlike defendants, he was a true believer and "should be allowed to reestablish his membership as the only person committed to maintain the faith." He averred that there currently is "no IHOD that can continue to give religious sustenance" to him because IHOD has been "destroyed" by Eversole and "exists in name only."

The damages that plaintiff alleged are spiritual in nature. As indicated, plaintiff alleged that he was "deprived of the means and mechanisms necessary for the free exercise of his chosen religion," "prevented from participating in the central tenet and goal of the religion—the

ingathering of the flock of God," and "deprived of the means to spread the gospel to others." He also alleged that he has suffered "extreme emotional distress from the loss of the means to practice his religion and the specter of being deprived of salvation." He alleged that these injuries "are particularized" as to him because he is "one of a very small group of adherents to the IHOD religion—of which the individual defendants are not." Plaintiff stated that he is "perhaps . . . the only person who is a true believer in the religion of IHOD with the capacity to manage the assets to advance its religious purpose." He alleged that "he may be the only party standing between continuation of IHOD doctrine and Defendant's theft and destruction of the religion for personal gain." On the basis of these allegations, plaintiff sought relief in various forms, including a declaratory judgment that defendants "have improperly and unlawfully diverted IHOD from its stated mission in violation of the trusts, bylaws, and decrees to which IHOD's assets are subject, and declaring Plaintiff is a person qualified to have possession and control of those assets consistent with those bylaws, trusts, and decrees."

As explained in *Winkler*, 500 Mich at 340-341, "[w]hat matters . . . is whether the actual adjudication of a particular legal claim would require the resolution of ecclesiastical questions; if so, the court must abstain from resolving those questions itself, defer to the religious entity's resolution of such questions, and adjudicate the claim accordingly." Plaintiff's claims were not based on purely secular principles of law. Rather, to issue a declaratory judgment that defendants had *improperly and unlawfully* diverted IHOD's mission, the trial court would have to find that Eversole and Ziebart did not adhere to IHOD's Articles of Faith and had improperly managed IHOD's assets since Estes's death. According to the Articles of Faith, IHOD's Pillars were charged with applying the property or proceeds to the purposes of the organization, particularly for preparing for the ingathering of Israel. Attorney Nemeth, who helped IHOD create the LLCs, attested that their purpose was to protect IHOD assets and maintain confidentiality. He also attested that the LLCs were single-member entities that were wholly owned by IHOD. To issue a declaratory judgment that these actions were somehow improper and illegal, the court would have to determine that placing IHOD assets into limited liability companies undermined the original purposes of IHOD and prevented preparations for the ingathering of Israel. These matters involve ecclesiastical questions related to church doctrine and polity, disputes the trial court correctly abstained from deciding. In addition, the court correctly abstained from deciding that plaintiff, despite his excommunication and his later voluntary agreement to relinquish his IHOD membership and never contact IHOD or its members again, was a proper member of IHOD, was faithful to IHOD's tenets, and was able and qualified to take control of IHOD's management and assets. Again, this determination would require the court to delve into forbidden matters of doctrine and polity. In sum, the trial court did not err by concluding that plaintiff's claims would require resolution of ecclesiastical issues, which was prohibited by the ecclesiastical abstention doctrine.

## III. STANDING

Plaintiff argues that the trial court also erred by ruling that he lacked standing to pursue his claims against defendants based on his release of his membership and any rights attendant to that membership in the Settlement Agreement, as well as his agreement to have no contact with IHOD or its members for the rest of his life. We again find no error.

Issues of standing are most commonly considered under MCR 2.116(C)(5) ("The party asserting the claim lacks the legal capacity to sue."). *Kaiser v Schreiber*, 258 Mich App 357, 370; 670 NW2d 697 (2003), rev'd on other grounds 469 Mich 944 (2003). In reviewing a motion under MCR 2.116(C)(5), "this Court must consider the pleadings, depositions, admissions, affidavits, and other documentary evidence submitted by the parties." *Aichele v Hodge*, 259 Mich App 146, 152; 673 NW2d 452 (2003).

"The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to 'ensure sincere and vigorous advocacy.'" *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 355; 792 NW2d 686 (2010), quoting *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633; 537 NW2d 436 (1995). "Thus, the standing inquiry focuses on whether a litigant 'is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable.'" *Lansing Sch Ed Ass'n*, 487 Mich at 355, quoting *Allstate Ins Co v Hayes*, 442 Mich 56, 68; 499 NW2d 743 (1993) (quotation marks and citations omitted).

Under the standing doctrine, "[o]ne cannot rightfully invoke the jurisdiction of the court to enforce private rights, or maintain a civil action for the enforcement of such rights, unless one has in an individual or representative capacity some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy." *Bowie v Arder*, 441 Mich 23, 42-43; 490 NW2d 568 (1992) (quotation marks and citation omitted). "This interest is generally spoken of as 'standing.'" *Id.* (quotation marks and citation omitted). "[W]henever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment." *Lansing Sch Ed Ass'n*, 487 Mich at 372. *Id.* A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large[.]" *Id.*

MCR 2.605(A)(1) governs declaratory judgments and provides:

> In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

Plaintiff argues that the "actual controversy" in the present case is whether the individual defendants "have wrongfully diverted IHOD's assets and shut the religion down." He maintains that this creates "a legal cause of action" and that it is "without question" that he is "an interested party" and therefore has standing to seek a declaratory judgment and the other remedies sought in the first amended complaint. However, to determine that the individual defendants, who had the positions of Pillar and trustee of IHOD, "wrongfully" handled IHOD's assets, a court would have to determine the proper purpose of IHOD and the use of its assets. The court would also have to find that defendants are not proper members of IHOD and that plaintiff was a proper member, who was wrongfully excommunicated and entered into a Settlement Agreement that was revocable.

Plaintiff infers, without factual support, that he was excommunicated because of the church leaders' bigotry regarding his homosexuality. Regardless of this unsupported inference, plaintiff was no longer a member of IHOD when he filed this action. He had been excommunicated in July 2013, by a resolution that provided that he had been removed from membership by unanimous vote of the "Official Board" of IHOD, which included the Pillars and Advisory Board, and as of

that date "has no rights" within IHOD and "may conduct no business in the name of" IHOD. The trial court rightly abstained from any deliberation regarding the fact of his excommunication and removal from IHOD membership, which was not reviewable by secular courts under the doctrine of ecclesiastical abstention.

Furthermore, regardless of the propriety of plaintiff's excommunication, in finding that plaintiff did not have standing to bring his claims, the trial court also relied on the Settlement Agreement in which plaintiff *voluntarily* relinquished his IHOD membership and all rights attendant thereto and agreed to have no contact with IHOD or any of its members for the rest of his life in exchange for financial compensation. The trial court did not err by finding that the Settlement Agreement deprived plaintiff of standing to bring his claims.

Plaintiff contends that he and the other departing members thought that IHOD would continue as a religion, true to the Articles of Faith and the vision of Benjamin Purnell, when they executed the Settlement Agreement. However, Paragraph 18 of the agreement provides, in pertinent part:

> This Agreement contains the entire understanding between the parties and supplants and supersedes all prior agreements or understandings between the parties of any kind or nature. The parties agree that this Agreement cannot be modified, amended, or terminated except by written instrument executed by the parties, and neither party is relying upon any oral representations or statements in executing this Agreement.

Nothing in the Settlement Agreement indicates that it was contingent or dependent upon IHOD's continued operation or existence in accordance with any particular tenets. Moreover, given plaintiff's express agreement to "irrevocably relinquish [his] IHOD membership and all rights attendant thereto," and also to not contact IHOD or any members and to not enter onto IHOD property for his natural life, there is no basis for finding that plaintiff continued to have any expectation or vested interest in the manner in which IHOD carried out its religious mission. Indeed, defendants submitted the affidavit of fellow departing member Gregory Furstenwerth, who averred that, in executing the Settlement Agreement, he understood that he "irrevocably gave up any and all rights I had in and with respect to IHOD, its property and its operations, including any right to membership in IHOD," he "agreed for the rest of my life not to contact IHOD or enter onto the property," he "agreed to release any and all claims I had against IHOD and its members, employees and agents," and he "agreed to keep the terms of the agreement confidential and to not disparage IHOD." Furstenwerth further averred, "In short, I understood that under the Settlement Agreement, I was to leave IHOD alone for the rest of my life and had no right to interject myself into its operation."

In sum, contrary to plaintiff's argument regarding the departing members' beliefs about the future of IHOD when they executed the Settlement Agreement, the agreement itself states that it contains the entire understanding between the parties and that, in executing the agreement, neither party was relying on any representations made outside the agreement. The agreement does not provide that IHOD will continue as a religion or what IHOD will do with its assets beyond paying the departing members a specific amount of consideration and working to resolve IHOD's tax irregularities. Plaintiff does not contend that IHOD failed to fulfill any of these obligations.

Plaintiff further argues that Paragraph 19 of the agreement specifically provides that either party has standing to seek interpretation or enforcement of the agreement. That paragraph provides in pertinent part:

> This Agreement will be construed under the laws of the State of Michigan. If there is a dispute as to the provisions, interpretation, or performance of the Agreement, the United States District Court for the Eastern District of Michigan shall have exclusive jurisdiction to resolve such disputes and to enforce this agreement. If there is a jurisdictional impediment then Oakland County Circuit Court shall serve as the alternative venue. Any claim, controversy or dispute arising out of or relating to this Agreement shall be submitted to arbitration with the American Arbitration Association ("AAA"). . . . .[1]

However, plaintiff's standing to enforce the Settlement Agreement does not give plaintiff standing to bring claims that are outside the scope of the agreement. Paragraph 19 preserves the parties' rights to bring disputes regarding any "continuing obligations under this Agreement" (Paragraph 8), which would include payment of the settlement amount (Paragraph 6), additional payments (Paragraph 7), dismissal of the Hawaii litigation (Paragraph 10), and tax indemnification (Paragraph 11). The claims alleged in plaintiff's amended complaint do not involve any of these matters.

In sum, the trial court did not err by ruling that plaintiff did not have standing to bring his claim for declaratory relief because he was not an interested party with regard to IHOD. Although plaintiff asserts that he remains an adherent of the IHOD religion, he voluntarily relinquished any rights of membership and any rights attendant thereto in exchange for a settlement payment, he does not participate in any of the activities or government of the group, and he agreed not to have contact with IHOD or any of its members for the remainder of his life. For the same reasons, plaintiff's other claims were properly dismissed because, as a nonmember without any attendant rights in IHOD, plaintiff lacked standing to bring claims for any alleged injury resulting from the management or transfer of IHOD's assets, or to bring any claims on behalf of IHOD itself.

## IV. QUO WARRANTO

Plaintiff next asserts that the trial court erred by finding that the facts before it did not support his quo warranto claim. We again find no error.

We review a trial court's decision whether to grant or deny an application for leave to proceed quo warranto for an abuse of discretion. *Barrow v Mayor of Detroit*, 290 Mich App 530, 539; 802 NW2d 658 (2010). An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

---

[1] In their motion for summary disposition, defendants included an arbitration request, which the trial court declined to address because defendants had not filed a counterclaim and the request was not properly before the court.

Quo warranto is a "common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed." *Black's Law Dictionary* (9th ed). MCR 3.306(A) provides this Court with exclusive jurisdiction over quo warranto actions "against a person who usurps, intrudes into, or unlawfully holds or exercises a state office, or against a state officer who does or suffers an act that by law works a forfeiture of the office." MCR 3.306(A)(1). All other quo warranto actions must be brought in circuit court. MCR 3.306(A)(2).

Under MCR 3.306(B)(1), an action for quo warranto is to be brought by the Attorney General when the action is against:

(a) a person specified in sub rule (A)(1).

(b) a person who usurps, intrudes into, or wrongfully holds or exercises an office in a public corporation created by this state's authority;

(c) an association, or number of persons, acting as a corporation in Michigan without being legally incorporated;

(d) a corporation that is in violation of a provision of the act or acts creating, offering, or renewing the corporation;

(e) a corporation that has violated the provisions of a law under which the corporation forfeits its charter by misuse;

(f) a corporation that has forfeited its privileges and franchises by nonuse;

(g) a corporation that has committed or omitted acts that amount to a surrender of its corporate rights, privileges, and franchises, or has exercised a franchise or privilege not conferred on it by law.

The prosecuting attorney of the proper county may bring other actions for quo warranto without leave of the circuit court and a citizen of the county may bring other actions by leave of the court. MCR 3.306(B)(2).

Under MCR 3.306(B)(3)(a), a "person" may apply to have the Attorney General bring an action for quo warranto specified in MCR 3.306(B)(1). If the person presents a proper application and offer of security, and the Attorney General refuses to bring the action, the person may apply to the appropriate court for leave to bring the action himself or herself. MCR 3.306(B)(3)(b). See also MCL 600.4501 ("The attorney general shall bring an action for quo warranto when the facts clearly warrant the bringing of that action. If the attorney general receives information from a private party and refuses to act, that private party may bring the action upon leave of the court.").

In the present case, plaintiff did make an application to the Attorney General, whose office declined to pursue the matter. Plaintiff then filed a motion under MCR 3.306(B)(3)(b) in the trial court for leave to bring a quo warranto claim in an amended complaint. Plaintiff advised the court that he thought his claim fit within MCR 3.306(B)(1)(d) or (e). The trial court granted plaintiff's motion to bring a quo warranto claim in an amended complaint. The only quo warranto claim that plaintiff raised in his first amended complaint, under his claim for declaratory judgment, alleged:

-14-

160.  Under MCR 2.605(A)(1), declaratory relief is a proper mechanism to preserve Plaintiff's legal rights and preserve IHOD as a going religion which Plaintiff will seek to grow if successful in this suit.

161.  Therefore,

A.  Plaintiff is entitled to this Court's declaratory judgment that Defendants have improperly and unlawfully diverted IHOD from its stated mission in violation of the trusts, bylaws, and decrees to which IHOD's assets are subject, and declaring Plaintiff is a person qualified to have possession and control of those assets consistent with those bylaws, trusts, and decrees.

B.  Alternatively, by virtue of his quo warranto powers, the attorney general, acting through Plaintiff, may request dissolution of IHOD and escheat of its assets to the State.

At the hearing on defendants' motion for summary disposition, plaintiff's attorney indicated that he had misspoken earlier and that he believed his quo warranto claim was appropriately brought under MCR 3.306(B)(1)(c), which provides for an action against "an association or number of persons, acting as a corporation in Michigan without being legally incorporated." The trial court granted summary disposition to defendants on the claim, holding that the facts before it did not support the claim.

This Court has stated that the most important considerations in granting leave to file quo warranto are (1) whether an appropriate application was made to the Attorney General, and (2) whether the application disclosed sufficient apparent merit to justify further inquiry by quo warranto proceedings. *Davis v Chatman*, 292 Mich App 603, 613-614; 808 NW2d 555 (2011); *City of Grand Rapids v Harper*, 32 Mich App 324, 329; 188 NW2d 668 (1971). There is no dispute that plaintiff made an appropriate application to the Attorney General; it is the second consideration set forth in *Davis* that plaintiff fails to meet.

IHOD is a voluntary religious association, not a corporation, and not chartered by the state. The other defendants are either individual members and officers of IHOD (Eversole and Ziebart) or limited liability companies. There were no facts showing that IHOD was acting as a corporation. The setting up of the IHOD LLCs was within the authority of the remaining Pillars and advisors of IHOD. According to the Articles of Faith, which continued to govern IHOD, the Pillars had "full and complete power to manage, control, and act in all spiritual and temporal affairs of the association as they deem best for this association and its members." The Pillars also had the authority to acquire real and personal property and were charged with applying the property or proceeds to the purposes of the organization. There was no evidence that Eversole and Ziebart acted outside their authority as officers of this voluntary religious association in setting up single-member LLCs as a management tool for IHOD assets. As such, the trial court did not err by finding that there were no facts before the court justifying further inquiry by quo warranto proceedings.

## V. MRE 408

Plaintiff also argues that the trial court erred by considering evidence that was inadmissible under MRE 408. We disagree.

MRE 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Plaintiff objects to defendants' inclusion of three exhibits submitted in support of their motion for summary disposition and their motion to disqualify plaintiff's counsel. Contrary to what plaintiff asserts, the record does not disclose that plaintiff filed a motion to strike these exhibits from defendants' motion for summary disposition, although he did submit a request to strike with his response to defendants' motion to disqualify his attorney. Because the motion to disqualify was submitted at the same time as the motion for summary disposition, and the trial court dismissed plaintiff's claims, the court did not address the latter request regarding the exhibits.

The exhibits involve a September 19, 2013 letter from plaintiff's attorney, David Black, to defendants' then attorney, Eric Nemeth; a June 22, 2017 e-mail from Black to Nemeth; and an August 31, 2017 letter from Black to defendants' current attorney, Kenneth Neuman. Defendants maintained that the exhibits were not precluded by MRE 408 because they were not offered "to prove liability for or invalidity of the claim or its amount," but rather were offered for "another purpose." When evidence of negotiations and settlement is offered "for another purpose," MRE 408 does not require its exclusion. *Gorman v Soble*, 120 Mich App 831, 842; 328 NW2d 119 (1982).

Defendants maintain that they submitted the September 19, 2013 letter from Black to Nemeth to show that the claims asserted in the present action were the same claims that plaintiff alleged before signing the Settlement Agreement, and therefore, the present claims were subject to the release contained in that agreement. Defendants' first argument in their motion for summary disposition was that plaintiff's claims were barred by the Settlement Agreement and release, and they were therefore entitled to summary disposition under MCR 2.116(C)(7). Because the letter was offered to show that plaintiff's current claims were the same claims that plaintiff had brought at the time the Settlement Agreement was executed, they were offered for "another," permissible purpose.

With regard to the June 22, 2017 e-mail from Black to Nemeth, and the August 31, 2017 letter from Black to Neuman, defendants offered these communications merely to show the history of plaintiff making demands on defendants. They did not ask the trial court to consider either communication to determine the validity or invalidity of either party's claims or the amount requested.

Furthermore, there is no indication that the trial court even considered this evidence, which was not material to the bases on which the trial court granted summary disposition. Therefore, to the extent that the documents could be considered inadmissible under MRE 408, appellate relief is not warranted.

## VII. CONCLUSION

The trial court did not err by granting summary disposition to defendants. The court correctly abstained from resolving plaintiff's claims to the extent they required the court to resolve matters of religious doctrine and polity. The trial court also properly concluded that because plaintiff had relinquished his membership in IHOD and all rights attendant thereto, he lacked standing to bring his claims against IHOD and its related entities and officers. Although plaintiff argues that the trial court prematurely granted summary disposition before discovery could be conducted, summary disposition may be granted before discovery if discovery does not stand a fair chance of uncovering factual support for a party's position. *Village of Dimondale v Grable*, 240 Mich App 553, 566; 618 NW2d 23 (2000). Considering the allegations in plaintiff's complaint, the terms of the prior Settlement Agreement, and the trial court's reliance on matters of law, there is no basis for concluding that further discovery would have assisted plaintiff. Therefore, we affirm the trial court's order granting defendants' motion for summary disposition. In light of our decision to affirm, it is unnecessary to consider defendants' alternative grounds for affirmance.

Affirmed.

/s/ Jane M. Beckering
/s/ David H. Sawyer
/s/ Michael F. Gadola

-17-